**PUBLISH**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 95-9361

D. C. Docket No. CR 195-011-01

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JEANETTE G. GARRISON,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Georgia

**(January 22, 1998)**

Before HATCHETT, Chief Judge, BIRCH, Circuit Judge, and CLARK,
Senior Circuit Judge.

BIRCH, Circuit Judge:

In this Medicare fraud appeal, we determine whether the owner and chief executive officer of a home healthcare provider properly was accorded a two-level enhancement in her sentence under U.S.S.G. § 3B1.3 for abusing a position of public trust by submitting falsified Medicare claims to a fiscal intermediary. The district court also imposed a two-level enhancement for an aggravating role in the offense under U.S.S.G. § 3B1.1(c) and departed upward in calculating the fine. Because the two-level enhancement for abuse of a position of public trust was improper, we vacate the sentence and remand for resentencing.

## I. BACKGROUND

From 1976 to 1995, defendant-appellant, Jeanette G. Garrison, an experienced businesswoman and registered nurse, was the owner, chief executive officer, and manager of Healthmaster Home Health Care, Inc. ("Healthmaster"),[1] which

---

[1] Although Healthmaster was owned jointly by Jeanette Garrison and her husband, Dr. Joseph Garrison, Jeanette Garrison operated the company.

provided home nursing care for patients with illnesses and disabilities. Based in Augusta, Georgia, Healthmaster operated in five states with twenty-two divisions, 125 separate locations, and 2,500 to 3,000 employees.[2] The Medicare program of the United States Department of Health and Human Services[3] reimbursed ninety to ninety-three percent of Healthmaster's costs for eligible individuals; the Medicaid program of the Georgia Department of Medical Assistance and private insurers reimbursed the balance of the expenses. To obtain reimbursement from Medicare, Healthmaster submitted reports documenting its costs to Aetna Life and Casualty Insurance Company ("Aetna"), which served as the fiscal intermediary for the Department of Health and Human

---

[2] Garrison began the company with one employee in 1976.

[3] The Medicare Act is part of the Social Security Act, 42 U.S.C. §§ 1395-1395cc. Medicare is a health insurance program that provides medical benefits primarily to persons sixty-five years of age and older who are eligible for Social Security retirement benefits and to individuals under sixty-five who have received Social Security benefits for at least two years. See 42 U.S.C. § 1395c. Medicare beneficiaries are entitled to have payments made on their behalf for certain inpatient and outpatient hospital care and related services supplied by a hospital or "provider." 42 U.S.C. § 1395d; 42 C.F.R. § 400.202 (1995).

Services, Health Care Financing Administration.[4]   The fiscal intermediary is charged with the responsibility of ensuring that Medicare payments are made to healthcare providers only for covered services and may reject or adjust claims.[5]   Garrison's conduct that supported her plea agreement and guilty plea showed that she directed the submission of cost reports by Healthmaster for nonallowable expenses, totaling an intended loss of approximately $1,200,000.

The first category of nonallowble expenses was political contributions.  Garrison instructed Healthmaster employee and attorney, Noel Ingram, to contact Healthmaster employees to solicit contributions for specific political candidates of Garrison's choice.

---

[4] Healthcare providers participate in the Medicare program by entering into a "provider agreement" with the Secretary of Health and Human Services ("Secretary"). See 42 U.S.C. § 1395cc.  The Secretary reimburses healthcare providers through "fiscal intermediaries," generally private insurance companies, which are responsible for determining the total amount of Medicare reimbursement owed to a provider each year in accordance with Medicare policy. See 42 U.S.C. § 1395g, 1395(h)(c)(1).   Under contract with the Department of Health and Human Services, a fiscal intermediary disburses Medicare benefit payments on a cost basis to providers.  42 C.F.R. § 421.1.

[5] A suspension of payments can be made without notice to the healthcare provider if the fiscal intermediary determines that the claims for Medicare reimbursement "involve[] fraud or willful nisrepresentation."  42 C.F.R. § 405.371(b).

Ingram collected the  political contributions from Healthmaster employees and gave them to Garrison, who dispensed the money to the political candidates.   The  employees who made political contributions were reimbursed subsequently through Healthmaster's payroll.  These payroll expenditures then were submitted by Healthmaster to Aetna and falsely identified as employee bonuses to qualify for reimbursement under Medicare. These reimbursements  by Medicare to Healthmaster more than tripled over a four-year period: $25,200 in 1989, $42,262.92 in 1990, $44,700 in 1991, and $83,864.47 in 1992.   The total amount of improper reimbursements by Medicare for this four-year period was $195,991.39.  In February, 1993, Garrison directed Healthmaster employee Mike Haddle, the cost report expert, to make cost report adjustments for the improper amounts claimed. An adjustment of $66,443 was made on the next cost report for the improper claims for political contributions.  Thus, the actual loss suffered by Medicare for improper political contributions was $129,548.77.

The second category of impermissible costs that Healthmaster submitted to Aetna and for which it received Medicare reimbursement was shared services. On cost reports submitted to Aetna, Garrison directed that Healthmaster employees, whose salaries were reimbursed by Medicare, be shown as fulltime Healthmaster employees, although they performed work for her other companies, primarily Master Health Plan, Inc. ("Master Health Plan"), a health maintenance organization, the costs of which were not reimbursebursable by Medicare.[6] Garrison instructed that Healthmaster bill Medicare for these shared service employees' salaries without deducting the non-Medicare work that they performed for her other companies. Additionally, she had cost reports filed that falsely represented her non-Healthmaster employees to be Healthmaster employees. As a result of both of

---

[6] In addition to Healthmaster and Master Health Plan, Garrison also owned Employee Benefit Coordinators, Inc., the purpose of which was to market Master Health Plan; Healthmaster Pharmaceutical and Equipment Company, Inc., which sold durable medical equipment; Healthmaster Homecare of Georgia, Inc. ("HM Homecare"), an independent, Medicaid-reimbursed company that provided home visitation services other than skilled nursing; and Preferred Care, Inc., which was a holding company for Equipment Company and HM Homecare.

both of these misrepresentations, Medicare improperly reimbursed Healthmaster $770,814.71 between 1989 and 1993. In February, 1993, Garrison instructed Haddle to make a cost report adjustment of $300,000 to compensate for the employees who spent a portion of their time working at Garrison's other companies, where salaries were not reimbursable by Medicare. The actual loss suffered by Medicare under Garrison's shared services scheme was $470,814.71.

The third category of nonallowable expenses that were reimbursed by Medicare was miscellaneous personal costs. Healthmaster received Medicare reimbursement for such expenditures as golfing trips to Pebble Beach, California, for a lobbyist and political figures; a trip by Garrison, her daughter, and Healthmaster employees to the 1992 Democratic Party National Convention; the partial purchase price of $30,000 for a travel agency, Morris Travel, bought by Garrison and disguised on cost reports as employee "training," complete with supporting sign-in sheets placed in Healthmaster files to deceive auditors; a

7

honeymoon cruise for a Healthmaster employee; a trip to the 1991

World Series in Minnesota; approximately $19,000 for alcohol

served at Healthmaster Christmas parties between 1989 and 1993;

approximately $22,000 for alcohol and food for Healthmaster's

Georgia Dome suite between 1992 and 1994; a 1986 Mercedes

Benz owned by Healthmaster that was traded for a 1993 Mercedes

for Garrison's son; and five pleasure trips to New York City, Las

Vegas, and Nashville taken by Healthmaster employees, for which

brochures, falsely indicating a business purpose for these trips,

were produced and placed in Healthmaster files to deceive

auditors. From 1989 to 1993, Healthmaster submitted to Medicare

as reimbursable expenses various miscellaneous personal costs

that amounted to $225,633.73.

Garrison was charged in a 133-count indictment with five

codefendants: Healthmaster, Master Health Plan, Dennis J. Kelly,

David W. Suba, and Managed Risk Services, Inc.[7] Represented by

---

[7] Kelly, a certified public accountant, was the chief financial officer and vice president of Healthmaster, or second-in-command under Garrison. He recommended that she hire Suba as an insurance risk manager. Kelly and Suba formed Managed Risk Services, Inc., of which Suba was president. These three

counsel, Garrison entered into a plea agreement with the government in which she acknowledged that she willfully had submitted fraudulent cost reports for Medicare reimbursement. Under the terms of the plea agreement, Garrison agreed to plead guilty to the first ten counts of the indictment,[8] to sell Healthmaster to an independent party, to pay $11,500,000 in restitution,[9] to forgo challenging a ten-year exclusion from participation as a healthcare provider in the Medicare program, and to cooperate with law enforcement by giving truthful information and testimony in the investigation and prosecution of unlawful activity.

In exchange, the government agreed to dismiss the remaining

_____

codefendants were tried jointly and convicted.

[8] Count 1 charged Garrison with conspiracy to defraud the United States in violation of 18 U.S.C. § 371. Counts 2 through 10 charged her with false statements to defraud the United States Medicare program in violation of 18 U.S.C. § 1001.

[9] Of the restitution amount, Garrison was to pay $10,000,000 to Medicare and $1,500,000 to Medicaid to reimburse these public health insurance programs for the losses caused by Garrison, Healthmaster, Master Health Plan, and related companies and their officers and employees to these respective programs. Under the restitution terms of Garrison's plea agreement, the government agreed to dismiss the indictment as to Healthmaster and Master Health Plan provided that full disgorgement was accomplished by these companies.

counts against Garrison,[10] to dismiss the indictment as to Healthmaster and Master Health Plan, to forgo in the Southern District of Georgia further prosecution of Garrison "or any entity in which she has majority ownership, directly or through trusts, or through trusts for her children, for any criminal act or omission occurring prior to the date of the Indictment that is currently known to the government," R1-331-5, to recommend a three-level reduction in offense level for acceptance of responsibility under U.S.S.G. § 3E1.1, to take no position on upward adjustments for aggravating role in the offense under U.S.S.G. § 3B1.1 and for abuse of a position of trust under U.S.S.G. § 3B1.3, and to forgo recommending a fine, provided that there was complete restitution of $11,500,000. Except for seeking a two-level enhancement for more than minimal planning under U.S.S.G. § 2F1.1(b)(2)(A) and a loss determination of approximately $1,630,000[11] under U.S.S.G. §

---

[10] The remaining indictment counts were: Counts 11-32, false statements to defraud the United States; Counts 36-78, mail fraud; Counts 79-105, money laundering; Counts 116-118, embezzlement from an employee benefit plan; and Count 133, forfeiture.

[11] This loss amount included $129,548.77 for improperly reimbursed political contributions, $770,814.71 for "ghost

2F1.1, the government agreed to make no recommendation regarding the sentence. While the government agreed to file a motion for downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities, provided Garrison fulfilled all of her obligations under her plea agreement, she understood and agreed that the decision to depart downward was within the sentencing court's discretion. Garrison stated that she entered into the plea agreement voluntarily without coercion or promises other than those in the agreement that resulted from negotiations with the government and her attorneys with her "authorization, knowledge and consent." R1-331-13.

At the plea proceeding, Garrison reaffirmed her understanding of the charges against her, the penalties that she confronted, and the terms of her plea agreement. She acknowledged that the plea agreement did not bind the district court and that she could receive

---

employees'" salaries, and $262,536.76 for pleasure trips and other improper billings. Although Garrison maintained that the amount of loss directly attributable to her was less than $500,000, the $1,630,000 loss calculated by the government was included in the restitution amount of $11,500,000, which Garrison agreed to pay under the terms of her plea agreement.

the maximum sentence on the counts to which she pled guilty. The district judge accepted Garrison's guilty plea after determining that she "is fully competent, fully aware of everything that is taking place here," that there "is an ample factual basis for the plea," and that "it is voluntary and made with a full appreciation of its consequences." R2-316-27-28.

Because Garrison acknowledged at her October 26, 1995, sentencing that she had reviewed the presentence report ("PSR") with her attorney and that it was factually accurate, the district judge adopted the account of Garrison's offenses in the PSR as his findings of fact. The district judge determined Garrison's offense level to be 20.[12] Garrison's criminal history category of I yielded a sentencing range of thirty-three to forty-one months of imprisonment and a fine of $7,500 to $75,000.

---

[12] Garrison's offense level of 20 reflected a base offense level of 6 under U.S.S.G. § 2F1.1(a) with the following adjustments: an 11-level increase for a loss of more than $800,000 but less than $1,500,000, U.S.S.G. 2F1.1(b)(1)(L); a two-level increase for more than minimal planning, U.S.S.G. § 2F1.1(b)(2)(A); a two-level increase for aggravating role in the offense, U.S.S.G. § 3B1.1(c); a two-level increase for abuse of a position of public trust, U.S.S.G. § 3B1.3; and a three-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1(a), (b).

The district judge imposed the minimum Guidelines prison term of thirty-three months, followed by three years of supervised release, during which time Garrison will be required to perform 200 hours of community service. Garrison also was ordered to pay restitution of $11,500,00, the amount stated in the plea agreement. The district court departed upward and imposed the maximum fine on each count to which Garrison pled guilty for a total fine of $2,500,000. At the sentencing proceeding, Garrison's attorney objected to the enhancements for abuse of a position of public trust and aggravating role in the offense as well as the upward departure in the fine.

On appeal, Garrison challenges her sentence enhancements for abuse of a position of public trust and for an aggravating role in the offense. She also contends that these enhancements subjected her to impermissible double counting.[13] Finally, she contests the upward departure of her fine as to notice and amount.

---

[13] Because we conclude that Garrison's sentence improperly was enhanced for abuse of a position of public trust and remand for resentencing without this enhancement, we need not address her double-counting issue.

## II. ANALYSIS

A. <u>Enhancement for Abusing a Position of Public Trust</u>

Garrison argues that her two-level enhancement for abuse of a position of public trust was erroneous since she did not occupy such a position because of the fiscal intermediary, Aetna, which directly requested reimbursement from Medicare for Healthmaster's healthcare services.   She also contends that any false statements made to Medicare were included in her crime of conviction, which precludes this enhancement under U.S.S.G. § 3B1.3.[14]   While the district court's factual determination that a defendant abused a position of public trust is reviewed for clear error, its conclusion that the defendant's conduct  justifies the abuse-of-trust enhancement is a question of law that we review <u>de novo</u>.  <u>United States v. Terry</u>, 60 F.3d 1541, 1545 (11th Cir. 1995), <u>cert. denied</u>, ___ U.S. ___, 116  S.Ct. 737 (1996).

---

[14] Given Garrison's sentencing date of October 26, 1995, we use the applicable United States Sentencing Guidelines Manual (1994) and statutes and regulations in effect on that date.  <u>See</u> <u>United States v. Camacho</u>, 40 F.3d 349, 354 (11th Cir. 1994) ("The sentencing court must employ the guidelines in effect at the time the sentencing hearing is held."), <u>cert. denied</u>, __ U.S. __, 115 S.Ct. 1810 (1995).

The abuse-of-trust enhancement provides:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by **2** levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.

U.S.S.G. § 3B1.3. The determination of whether a defendant occupied a position of trust that would warrant this enhancement is made from the perspective of the victim of the crime. See United States v. Zaragoza, 123 F.3d 472, 481 (7th Cir.), cert. denied, ___ U.S. ___, 118 S.Ct. 317 (1997); United States v. Mackey, 114 F.3d 470, 475 (4th Cir. 1997); United States v. Castagnet, 936 F.2d 57, 62 (2d Cir. 1991); United States v. Hill, 915 F.2d 502, 506 n.3 (9th Cir. 1990). "For the enhancement to apply, defendant must have been in a position of trust with respect to the victim of the crime," United States v. Ragland, 72 F.3d 500, 502 (6th Cir. 1996) (emphasis added), and "the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense," U.S.S.G. § 3B1.3, comment. (n.1); "[s]uch persons generally are viewed as more culpable," id.

comment. (backg'd.).[15]  In the fraud context, section 3B1.3 has

been recognized to apply in two situations: (1) "where the

defendant steals from his employer, using his position in the

company to facilitate the offense," and (2) "where a 'fiduciary or

personal trust relationship exists' with other entities, and the

defendant takes advantage of the relationship to perpetrate or

conceal the offense."  United States v. Koehn, 74 F.3d 199, 201

(10th Cir. 1996) (quoting United States v. Brunson, 54 F.3d 673,

677 (10th Cir.), cert. denied, ___ U.S. ___, 116 S.Ct. 397 (1995)).

This case involves the latter category.

Because "there is a component of misplaced trust inherent in

the concept of fraud," United States v. Mullens, 65 F.3d 1560, 1567

(11th Cir. 1995), cert. denied, ___ U.S. ___, 116  S.Ct. 1337

(1996), a sentencing court must be careful not to be "overly broad"

in imposing the enhancement for abuse of a position of trust or "the

sentence of virtually every defendant who occupied any position of

---

[15] See Stinson v. United States, 508 U.S. 36, 42-43, 113 S.Ct. 1913, 1917-18 (1993) (holding that Sentencing Guidelines commentary, which is interpretive and instructive to application of a guideline, is binding on federal courts).

16

trust with anyone, victim or otherwise" would receive a section 3B1.3 enhancement, United States v. Moored, 997 F.2d 139, 145 (6th Cir. 1993).[16]  See Koehn, 74 F.3d at 201 ("In every successful fraud the defendant will have created confidence and trust in the victim, but the sentencing enhancement is not intended to apply in every case of fraud."); United States v. Boyle, 10 F.3d 485, 489 (7th Cir. 1993) ("Whether someone occupies a 'position of trust' for purposes of § 3B1.3 does not turn on simple categories that might be used to characterize the relationship. . . .Therefore, the sentencing court must look beyond descriptive labels to the actual nature of the relationship and the responsibility the defendant is given.").   In analyzing whether section 3B1.3 applies in a fiduciary or personal trust situation, sentencing and reviewing courts must "distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's

---

[16] As examples, our court has determined that neither a food service foreman, arrested while attempting to smuggle cocaine into a federal penitentiary, United States v. Long, 122 F.3d 1360, 1365-66 (11th Cir. 1997), nor a president and sole shareholder of an investment company that actually was a Ponzi scheme, Mullens, 65 F.3d at 1566-67, abused a position of trust making them eligible for a § 3B1.3 enhancement as imposed by the respective district courts.

credulity, and relationships in which the victim's trust is based on defendant's position in the transaction." Koehn, 74 F.3d at 201; see Mullens, 65 F.3d at 1567 ("Fraudulently inducing trust in an investor is not the same as abusing a bona fide relationship of trust with that investor."). Since the "primary concern of § 3B1.3 is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-detect wrong," only such a defendant whose position enables or significantly facilitates the offense is eligible for this enhancement.[17] Koehn, 74 F.3d at 201 (emphasis added); see Brunson, 54 F.3d at 678 ("The guideline enhancement requires more than a mere showing that the victim had confidence in the defendant. Something more akin to a fiduciary function is required.").

The application note accompanying section 3B1.3 explains:

"Public or private trust" refers to a position of public or private trust characterized by professional or managerial

---

[17] The Tenth Circuit further explained: "It follows that not every misuse of a fiduciary relationship will subject a defendant to the enhancement; he must either occupy a 'formal position of trust' or create sufficient indicia that he holds such a position that it is appropriate to hold him so accountable." Koehn, 74 F.3d at 201-02 (quoting United States v. Queen, 4 F.3d 925, 929 n.3 (10th Cir. 1993)).

discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).  Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily nondiscretionary in nature.  . . . This adjustment, for example, would apply in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination.  This adjustment would not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3, comment. (n.1).  Thus, "the abuse of trust enhancement applies only where the defendant has abused discretionary authority entrusted to the defendant by the victim"; arm's-length business relationships are not available for the application of this enhancement.[18]  United States v. Jolly, 102 F.3d

---

[18] The Sixth Circuit has provided elucidating clarification regarding the type of trust that must be abused for a § 3B1.3 enhancement to be applicable:

Clearly, then, the notion of "trust" embodied in the guideline is not the one contemplated by the ordinary dictionary concept of reliance or confidence for, in that sense, a bank trusts its tellers not to steal from the till.  Rather, as used in the guideline, "position of public or private trust" is a term of art, appropriating some of the aspects of the legal concept of a trustee or fiduciary.  The lesser degree of direct supervision exercised over fiduciaries or senior employees as opposed to cashiers, and hence the greater difficulty in detecting their transgressions, may

19

46, 48 (2d Cir. 1996) (emphasis added); compare United States v. Brenson, 104 F.3d 1267, 1287-88 (11th Cir.) (concluding that grand juror who provided ongoing information to individual under grand jury investigation for drug smuggling and money laundering violated a position of public trust and warranted § 3B1.3 enhancement), cert. denied, ___ U.S. ___, 118 S.Ct. 214 (1997); Terry, 60 F.3d at 1545 (determining that deputy sheriff who used his office and patrol car to prevent police interception of his drug sales to an undercover agent correctly received an enhancement for abuse of a position of public trust); United States v. Pedersen, 3 F.3d 1468, 1469-72 (11th Cir. 1993) (upholding a section 3B1.3 enhancement for police officer who unlawfully used his access to confidential information

---

explain part, but not all, of the distinction. . . . Where an individual makes himself particularly vulnerable by entrusting another with substantial authority and discretion to act on his behalf and then relies upon and defers to that person, a decision to take advantage of that trust and vulnerability is particularly abhorrent, as it undermines faith in one's fellow man in a way that the ordinary pickpocket simply cannot.

Ragland, 72 F.3d at 502-03 (citations omitted) (vacating district court's § 3B1.3 enhancement for bank customer service employee who executed a fraud scheme by forging bank officers' signatures and taking funds left for deposit by bank customers because she did not occupy a position of public or private trust).

stored in various government data bases, including the National Crime Information Center, the Federal Bureau of Investigation, and the Social Security Administration to assist a corporation that sold personal background information to employers, investigators, and others and which was a customer of his investigation business); United States v. Claymore, 978 F.2d 421, 423 (8th Cir. 1992) (holding that police officer who raped a thirteen-year-old girl, whom he had apprehended for curfew violation, and fathered her child properly received a section 3B1.3 enhancement for using his position of trust to detain the victim and his patrol car in which  to rape her) with Mullens, 65 F.3d at 1566-67 (determining that the district court erroneously applied a section 3B1.3 enhancement in sentencing  president and sole shareholder of an investment company that was a Ponzi scheme because there was no special or fiduciary relationship with the investors).

Instructive to our analysis of this case is United States v. Broderson, 67 F.3d 452 (2d Cir. 1995), which is analogous because the defendant received a section 3B1.3 enhancement for

submitting false information to a government agency. The defendant in <u>Broderson</u>, a vice president of Grumman Data Systems Corporation, had negotiated a contract with the National Aeronautics and Space Administration ("NASA") to provide supercomputer hardware, software, and related integration and maintenance services to the Lyndon B. Johnson Space Center in Houston, Texas. The contract negotiations were governed by the Truth in Negotiations Act ("TINA"), 10 U.S.C. § 2306a, and the implementing regulations for TINA in the Federal Acquisition Regulations ("FAR"), 48 C.F.R. §§ 15.801-15.804. Both TINA and FAR required Broderson, who was responsible for preparing and submitting Grumman's proposals to NASA, to disclose to NASA all cost and pricing information until NASA and Grumman reached an agreement. Broderson arranged to finance Grumman's purchase of the supercomputer hardware through a third-party financing company and lease the equipment to NASA. The financing company initially offered an interest rate of 13.77 percent, and he disclosed this rate to NASA. Broderson, however, failed to inform

22

NASA that the financing company subsequently reduced the interest rate to 10.5 percent. He submitted to NASA two Certificates of Current Cost or Pricing Data, which falsely stated that, to the best of his knowledge and belief, Grumman's cost and pricing information were accurate and current. The final contract provided lease payments over fifty-seven months at the 13.77 percent interest rate. Thereafter, Grumann sold the lease payments to the financing company at the 10.5 percent interest rate. A jury convicted Broderson of executing a major fraud scheme by incorrectly pricing a government contract valued at more than $1,000,000, wire fraud, and making false statements to the United States. At sentencing, the district court assigned Broderson a base offense level of six under U.S.S.G. § 2F1.1(a) and enhanced his sentence two levels under section 3B1.3 for abuse of a position of public trust.

In determining that the section 3B1.3 enhancement was erroneous and remanding for resentencing, the Second Circuit determined that Broderson "did not occupy a position of trust vis-a-

23

vis the government" because "TINA and FAR imposed specific legal obligations . . . that he failed to fulfill." Broderson, 67 F.3d at 455. Deriving guidance from the examples in the commentary to section 3B1.3, "an attorney embezzling a client's money, a bank executive executing a fraudulent loan scheme, and a physician sexually abusing a patient during an examination," that court concluded that the position of trust addressed by section 3B1.3 referred to discretion specifically entrusted to the defendant by the victim. Id. at 456; see U.S.S.G. § 3B1.3, comment. (n.1); see also United States v. Yount, 960 F.2d 955, 957 (11th Cir. 1992) (summarily affirming section 3B1.3 enhancement for bank vice-president and trust officer who misappropriated for his own use trust accounts of elderly persons, none of whom lived independently). Rejecting the government's overbroad definition of a position of trust, the Second Circuit explained:

> The government's theory seems so far reaching that it might cause virtually anyone who is commanded by statute to make an accurate report to the government to be subject to a Section 3B1.3 enhancement. All taxpayers who file false tax returns, for example, might be included. We believe that it is fairly obvious that the

> Sentencing Commission harbored no intent that the enhancement be so sweeping.
>
> . . . .
>
> Broderson was a high-ranking executive at Grumman and therefore had managerial discretion to negotiate for that company. Had he accepted a bribe from another party to give that party better terms than were necessary, that would have abused his position of trust. In contrast, NASA entrusted Broderson with no discretion whatsoever and whatever "trust" NASA placed in Broderson was based strictly on the explicit commands of TINA and FAR.

Broderson, 67 F.3d at 455, 456; see United States v. Kummer, 89 F.3d 1536, 1546-47 (11th Cir. 1996) (upholding section 3B1.3 enhancement for a financial secretary of a local labor union and a general representative of the international union for using funds from the union's health and welfare plan to purchase stock in a construction project in exchange for obtaining a personal home loan).

Garrison similarly argues that abuse of trust in her position as chief executive of Healthmaster would occur if she had accepted a bribe from a party negotiating with Healthmaster to Healthmaster's detriment. In contrast, she contends that "false statements on the cost reports submitted to a fiscal intermediary for the Government

do not implicate such a trust relationship."  Appellant's Brief at 26.

Significantly, when an arm's length relationship existed between

the defendant and the victim such that the discretionary authority

entrusted to the defendant was not directly from the victim, a

section 3B1.3 enhancement was held to be improper.  See, e.g.,

Jolly, 102 F.3d at 48-50 (concluding that president of corporation

did not stand in a position of trust relative to creditors of the

corporation); United States v. West, 56 F.3d 216, 221 (D.C. Cir.

1995) (holding that title of president carried "no special weight"

because it was not the position in the company but the exercise of

managerial and professional discretion with respect to the task

hired by a customer to perform that determined eligibility for abuse-

of-trust enhancement); Brunson, 54 F.3d at 675-78 (determining

that no trust relationship exists in a typical arm's-length commercial

relationship where defendant, who defrauded the Russian Coal

Corporation of over four million dollars and transferred into his

personal bank account sums, which he used personally for luxury

automobiles, purchase of a residence, vacations, jewelry, computer

hardware and software, college tuition for his son, furniture, and home improvements); Moored, 997 F.2d at 144-45 (deciding that a section 3B1.3 enhancement is improper when defendant abused a position of trust with a third party; in applying for loans, defendant falsified an offer to purchase stock as well as falsified a letter of credit from a bank).

In this case, the PSR, adopted by the district court, states that "[t]he Medicare program of the United States Department of Health and Human Services is the primary victim in the instant offense." PSR at 5, ¶ 10 (Sept. 25, 1995). As in Broderson, statutory reporting requirements do not create a position of trust relative to a victim of the crime. Furthermore, Garrison and Healthmaster did not report directly to Medicare but to Aetna, the fiscal intermediary whose specific responsibility was to review requests for Medicare reimbursement before submitting those requests to Medicare. Because of this removed relationship to Medicare, plus Aetna's review of Healthmaster's Medicare requests, Garrison and Healthmaster were not directly in a position of trust in relation to

27

Medicare.  While Medicare may have been the victim in this case, the section 3B1.3 enhancement is unavailable because Garrison did not occupy a sufficiently proximate position of trust relative to Medicare.   Additionally, Garrison did not hold a position of discretion concerning her crime of false reporting to Medicare, as required for application of the abuse-of-trust enhancement.  As her counsel explained at sentencing, Garrison lacked the discretion and ability to conceal the false cost reports submitted for Medicare reimbursement and relied on others to accomplish this deception.[19]

---

[19] At sentencing, Garrison's counsel explained her lack of ability to defraud Medicare and her reliance on financial experts at Healthmaster for filing the false cost reports for Medicare reimbursement:

> [T]he crime here is false statements, that is filing false reports for Medicare reimbursements.
> Far from having specialized knowledge, Mrs. Garrison had to hire people who had specialized knowledge to do that.  She didn't do it.  She didn't do the cost reports.
> When she opened up her office by herself in one room with a straight-back chair and a folding card table, the next employee she hired- – she was looking for people to take over the books because she was in the nursing side of the business.
> The more and more she got into her business, the more she relied on people who had been federal auditors in the past, who were CPAs, who understood the intricacies of this process.
> She hired Joe Norman.  She hired Mike Haddle. These are the people who had the specialized knowledge, not Mrs. Garrison.  She does not -- -- it does not apply to her in terms of the enhancement for specialized knowledge.

28

In contrast to Garrison's lack of discretion and inability to

_____

    . . . .
    Mrs. Garrison didn't deal with the federal
auditors.  When the federal auditors came to
Healthmaster, they didn't go and spend their days with
Mrs. Garrison.  They spent their days with Dennis
Kelly.  They spent their days, maybe some of those
days, with the cost report expert, Mike Haddle.
    But primarily, if not exclusively, Dennis Kelly
was the point person for dealing with the federal
auditors, not Mrs. Garrison.  So it [section 3B1.3]
doesn't apply to her.
    . . . .
[T]heir [the government's] basic position . . . is Mrs.
Garris4n was the CEO of these companies, and we all
need to have correct Medicare reimbursement.
    That's not enough for the enhancement because, in
order to have an enhancement because of level of
authority, that level of authority must have
facilitated -- -- substantially facilitated the
commission of the crime.
    <u>Simply because Mrs. Garrison was the CEO of the
company, that does not, therefore, under the case law,
give the Court or this report [PSR] the authority to
enhance her based upon her CEO status.</u>  Far from it.
    The report discusses that she had direct access to
the cost reports and discusses manipulation of the
reports and document production.  Absolutely no, Your
Honor.  There are no facts in this report or no facts
before this Court which show that Mrs. Garrison had
anything to do with the federal auditors because that
wasn't her job.
    There are no facts before this Court and no facts
in this report which deal with Mrs. Garrison
manipulating reports and documents which were presented
to the federal auditors.  There are no facts in this
report and no facts before the Court about Mrs.
Garrison manipulating any document production.  That
wasn't her job.
    There were people in that company that did have
hands-on dealings with those auditors: Dennis Kelly, he
was the point man; the expert, Mike Haddle, he was, I
assume, one of the individuals who would be dealing on
a day-to-day basis with retrievable documents.  But not
Mrs. Garrison.

R4-11, 12-14 (emphasis added).

produce the fraudulent Medicare reimbursement requests as section 3B1.3 envisions is a physician who possesses the expertise to create erroneous medical records and, consequently, fraudulent Medicare reports that are difficult to detect and to question.[20] Cf. United States v. Rutgard, 108 F.3d 1041, 1064 (9th Cir.) (holding that the section 3B1.3 enhancement was warranted because the ophthalmologist convicted for Medicare fraud abused the trust implicit in a "in a professional medical practice" because of the essential "trust between patient and physician . . . and because the government as insurer depends upon the honesty of the doctor and is easily taken advantage of if the doctor is not honest"), amended

---

[20] Clearly, Garrison did not possess a special skill that would warrant a § 3B1.3 enhancement by facilitating the commission or concealment of her crimes. See United States v. Calderon, 127 F.3d 1314, ___ (11th Cir. 1997) (affirming § 3B1.3, special skill enhancement for appellants who were convicted for cocaine importation and who specifically captained a cocaine-laden,38-foot cabin cruiser from the Bahamas to South Florida at night with only a chart and a compass and without lights to elude detection by law enforcement agents); United States v. Carlson, 87 F.3d 440, 446-47 (11th Cir. 1996) (approving § 3B1.3, special skill enhancement for chemist who pled guilty to the manufacture and distribution of illegal drugs and who developed laboratories in Panama and Brazil to produce these drugs for distribution), cert. denied, ___ U.S. ___, 118 S.Ct. 238 (1997); United States v. Malgoza, 2 F.3d 1107, 1110-11 (11th Cir. 1993) (per curiam) (upholding § 3B1.3, special skill enhancement for radio operator convicted of conspiring to  import cocaine for his knowledge of radio frequencies and his ability to set the necessary equipment to contact the source of the cocaine in Colombia).

on other grounds, 116 F.3d 1270, 1293 (9th Cir. 1997); United States v. Adam, 70 F.3d 776, 782 (4th Cir. 1995) (upholding section 3B1.3 enhancement and recognizing that "welfare fraud is terribly difficult to detect because physicians exercise enormous discretion: their judgments with respect to necessary treatments ordinarily receive great deference and it is difficult to prove that those judgments were made for reasons other than the patients' best interests." (emphasis added)).   Garrison did not have the expertise to produce the fraudulent Medicare reports; Kelly, a certified public accountant, vice president and second  in command at Healthmaster, was tried and convicted for generating the fraudulent Medicare reports.   Kelly and others working under his supervision, not Garrison, caused the fraudulent Medicare claims to be difficult for Aetna to detect.  Accordingly, we conclude that the district court's determination that Garrison occupied a position of trust with respect to Medicare was clearly erroneous because she did not produce the fraudulent Medicare claims, and the fiscal intermediary, Aetna, did not discover the erroneous reports upon

31

reviewing them.[21]   Garrison's relationship with Medicare was too attenuated for her to have received the abuse-of-trust enhancement because Medicare relied on Aetna to review and to submit proper claims for Medicare reimbursement.

In addition to arguing that she did not occupy a position of trust relative to Medicare within the meaning of section 3B1.3, Garrison also contends that the district judge erred in imposing the section 3B1.3 enhancement, which does not apply if abuse of trust was "included in the base offense level or specific offense characteristic."   U.S.S.G. § 3B1.3.  She argues that the offense to which she pled guilty, perpetrating a fraud on Medicare through false cost reports, is the same as the basis for the enhancement for an abuse of a position of public trust.   We agree.

In Broderson, the Second Circuit explained that "[t]he conduct that is the basis of the conviction must be independently criminal . .

_____

[21] While medical diagnoses and treatments determined as a result of a physician's training and experience may be difficult, if not impossible, to detect by a fiscal intermediary, the medical costs for such items as supplies submitted by Healthmaster for reimbursement by Medicare were ascertainable by Aetna.

. and not itself the abuse of trust." Broderson, 67 F.3d at 456; see Jolly, 102 F.3d at 49 (determining that the trust involved in an arm's-length, non-fiduciary fraud is the victim's reliance on misleading statements, which is "a specific offense characteristic of fraud, and a Section 3B1.3 enhancement is inappropriate"). Because Broderson's fraudulent conduct was signing the certificate stating that Grumman had complied with the applicable regulations, "[a]ny abuse of trust was therefore 'included in the base offense level' of six for fraud and deceit." Broderson, 67 F.3d at 456 (quoting U.S.S.G. § 3B1.3). Similarly, this court in Mullens determined that Mullens's control over the investment company's accounts facilitated his fraud offense, which was another way of stating that he controlled an elaborate, well-organized Ponzi scheme. Because the district judge had enhanced Mullens's sentencing guideline range for that conduct, an additional enhancement for abuse of trust was improper. Mullens, 65 F.3d at 1567; cf. United States v. Clark, 989 F.2d 447, 449 (11th Cir. 1993) (affirming section 3B1.3 enhancement for police officer who pled

guilty to accepting bribes for protecting cocaine transactions during reverse sting because his base offense level for cocaine possession "d[id] not include the factor of abuse of a position of trust").

Since Garrison's base fraud crime was the submission of false statements on cost reports submitted to Aetna for Medicare reimbursement, she cannot receive an enhancement for abuse of a position of public trust based on the same conduct under the specific terms of section 3B1.3. Additionally, Garrison had no special expertise and was more removed from the criminal conduct at issue in this case than the defendants in Mullens or Broderson because she did not create or submit the false Medicare claims to Aetna for approval; they were produced by Kelly and others at Healthmaster who had the ability to formulate the reports. Because Garrison did not hold a direct or fiduciary-type position of public trust relative to the Medicare program, the victim, and her fraud crime of conviction encompasses the same false cost reports that the district judge used as the basis for her abuse-of-public-trust

34

enhancement, the district judge on remand will resentence Garrison without the section 3B1.3 enhancement.

B. Enhancement for Aggravating Role in the Offense

Garrison argues that the district judge improperly enhanced her sentence by two levels under U.S.S.G. § 3B1.1(c) for her aggravating role in the crimes to which she pled guilty.  She contends that there is no evidentiary basis to support a finding that she was a leader or manager of one or more participants in her crime of false statements.  We review the sentencing court's determination of  role in the offense for clear error.   United States v. Tapia, 59 F.3d 1137, 1143 (11th Cir.), cert. denied, __ U.S. __, 116 S.Ct. 401, and cert. denied, ___ U.S. ___, 116  S.Ct. 546 (1995).

Under section 3B1.1(c), the district judge is authorized to increase a sentence by two levels if "the defendant was an organizer, leader, manager, or supervisor in any criminal activity" other than extensive criminal conduct involving five or more participants.  U.S.S.G. § 3B1.1(c).   To qualify for this

enhancement, the defendant must have organized, led, managed or supervised "one or more other participants." U.S.S.G. § 3B1.1, comment. (n.2). "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." Id. comment. (n.1). The application notes further guide the district court "[i]n distinguishing a leadership and organizational role from one of mere management or supervision":

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Id. comment. (n.4); see United States v. Ramsdale, 61 F.3d 825, 830 (11th Cir. 1995) (using U.S.S.G. § 3B1.1, comment. (n.4) to determine role in the offense).

Garrison's direction of Ingram, Healthmaster's in-house attorney with Medicare expertise, in the political contributions scheme, described in the conspiracy count to which Garrison pled guilty, supports the district judge's conclusion that Ingram was a

participant in Garrison's political contributions scheme within the

meaning of section 3B1.1, comment. (n.1).[22]  Moreover, at the

_____

[22] The political contributions scheme, including Garrison's direction of Ingram, an unindicted coconspirator, is alleged as follows in the conspiracy count of the indictment to which Garrison pled guilty:

1. In the fall of 1989, [Garrison] directed [Ingram] to solicit political contributions from various HEALTHMASTER, INC. employees for a gubernatorial candidate.

2. [Ingram] then prepared and submitted for [Garrison's] approval a list of potential employees to be approached for a $200.00 political contribution.

3. At [Garrison's] direction, [Ingram] then contacted each of the HEALTHMASTER, INC. employees, requested the $200.00 political contributions, and told the employees that they would be reimbursed $400.00 by HEALTHMASTER, INC. if the contribution was made.

4. At [Garrison's] behest, [Ingram] then collected the employees' personal contribution checks.

5. Soon thereafter, in the fall of 1989, the list of contributing employees was submitted to HEALTHMASTER, INC.'s payroll office with instructions from [Garrison] that each employee who contributed $200.00 should be reimbursed or given a "bonus" in the amount of $400.00.

6. HEALTHMASTER, INC. then reimbursed each contributing employee in the amount of $400.00.

7. On approximately twenty different occasions, between 1989 and 1992, [Garrison] directed [Ingram] to solicit political contributions from HEALTHMASTER, INC. employees for a total of approximately ten different political candidates selected by [Garrison], in generally the same manner as described above.

8. Thereafter, from 1990 through 1992, HEALTHMASTER, INC. submitted annual cost reports to Medicare claiming reimbursement for its employees' wages, which included the amounts reimbursed those employees for political contributions.

change of plea proceeding, Garrison admitted to the district judge that she had "solicited political contributions and reimbursed employees through compensation on a cost report that was reimbursed by Medicare." R2-12. Additionally, Special Agent Stephen Robertson of the Georgia Bureau of Investigation testified concerning the reimbursement of political contributions:

> Jeanette Garrison had an employee, Noel Ingram, contact a group of employees and solicit contributions for specific political candidates. A list of these contributions was maintained.
> The employees would give their contributions to Ms. Ingram, who would give them to Mrs. Garrison for presentation to the candidate.
> The employees were reimbursed through payroll, which was, in turn, submitted by cost report to Medicare for reimbursement.

---

9. In this manner, between 1989 and 1992, HEALTHMASTER, INC. fraudulently reimbursed its employees' political contributions in the total amount of approximately $195,991.39. In or about March, 1993, after a former employee of one of Garrison's companies, EBC, filed a lawsuit against EBC which threatened to publicly disclose the Healthmaster political contribution scheme, HEALTHMASTER, INC. made just one cost report adjustment of only approximately $66,443.00 for political contributions in 1992. HEALTHMASTER, INC. fraudulently obtained reimbursements from Medicare for the balance of its employees' political contributions.

R1-1-14-16.

Id. at 14-15.[23]  Not only did Garrison decline to cross-examine

Robertson, but also she conceded that his account was

"[s]ubstantially correct."  Id. at 17.

At sentencing, Garrison's attorney acknowledged to the court

that "Mrs. Garrison directed Noel Ingram to solicit political

contributions.  Absolutely right.  Mrs. Garrison did solicit Noel

Ingram, or direct her, to go out and solicit political contributions.

We have no quarrels with that, and we don't dispute that."  R4-25.

The attorney for Healthmaster further testified at sentencing that,

after Garrison encountered  legal problems with her healthcare

---

[23] At the sentencing hearing, the probation officer testified as follows regarding Ingram's participation in the Medicare fraud and Garrison's direction of her:

> In the role in the offense issue, there is no question that Mrs. Garrison directed Noel Ingram to solicit the political contributions from other employees within the company.  As chairman of Healthmaster, Mrs. Garrison was the only person there who could tell someone to go out and solicit these contributions.
> The fact that Noel Ingram did not necessarily submit the cost report is not critical.  The element of the offense in relevant conduct here allows that to be considered, that she was directed by Mrs. Garrison to commit that fraud.
> The fact that [Ingram] was not charged criminally is a decision that the Government made.  There is no indication that that was necessarily not a criminal act.

R4-22.

businesses, she instructed Kelly, second in command at Healthmaster, and Haddle, the cost report expert, to determine "if there had been improper entries in the cost reports relating to political contributions and to fix all the cost reports applicable. . . . The direction was to take whatever steps were necessary to correct the cost reports and get them right." Id. at 30, 31. The factual account of Garrison's instruction of Ingram concerning political contributions as stated in the PSR, which the district judge adopted with no objection from Garrison, supports Ingram's participant status as well as Garrison's aggravating role in the crime under section 3B1.1(c) and describes how Ingram collected hundreds of thousands of dollars at Garrison's direction over a four-year period.[24]

---

[24] The following factual account of the political contributions scheme is stated in the PSR under offense conduct:

> In the instant offense, Garrison had employee, Noel Ingram, contact a group of employees each year in an effort to solicit political contributions for specific political candidates. The employees gave their political contributions to Ingram who then gave them to Garrison for presentation to the respective political candidates. Employees were later reimbursed through Healthmaster, Incorporated's payroll expenditures. These payroll expenditures were in turn submitted by Healthmaster, Incorporated to Aetna as employee bonuses which qualified for reimbursement through Medicare

40

This record evidence refutes Garrison's representation that "[t]he Government failed to prove, and the trial court did not find, Ingram participated knowingly in some part of the criminal enterprise," which precludes her from being a participant under section 3B1.1(c). Appellant's Brief at 35. Garrison would not have trusted an unwitting pawn to play such an important role in her political contributions scheme. Ingram's delegated responsibilities

---

funds. In 1989, Healthmaster, Incorporated submitted cost reports in the form of bonuses which were, in fact, reimbursements for political contributions in the amount of $25,200. In 1990, the false reimbursements for political contributions totaled $42,262.92. In 1991, the false reimbursements for political contributions totaled $44,700. In 1992, the reimbursements for political contributions totaled $83,864.47. The reimbursements from Medicare for political contributions for the calendar years 1989 through 1992 totaled $195,991.39. However, in February 1993, Garrison directed employee Mike Haddle to make a cost adjustment of approximately $66,443 to Aetna for reimbursement to Medicare for the political contribution reimbursements. Therefore, Medicare suffered a direct loss of $129,548.77 as a result of the political contribution reimbursement scheme. However, the intended loss to Medicare was $195, 991.39.

PSR at 4, ¶ 6 (emphasis added). With respect to the two-level enhancement for Garrison's aggravating role in the offense, the PSR states: "Pursuant to U.S.S.G. § 3B1.1(c), the offense is increased two levels. Garrison was the chief executive officer and owner of Healthmaster, Incorporated. Garrison directed employee, Noel Ingram, to solicit political contributions from other employees. The defendant, therefore, is correctly described as a leader and manager in the instant offense." Id. at 6, ¶ 19.

41

in that scheme consisted of deciding which employees to solicit, serving as Garrison's liaison to those employees, promising them a $400 reimbursement for each $200 contribution, collecting a considerable amount of money from these employees over a four-year period of time, and delivering to Garrison the funds. Garrison then distributed the money to candidates of her choice, fraudulently billed Medicare for it, and recycled the Medicare reimbursements to the contributing employees with a hundred percent interest on their contributions. Rather than being a dupe, Ingram was Healthmaster's in-house attorney whose expertise was Medicare regulations, the very law that Garrison's political contributions scheme violated.[25] Additionally, Garrison not only used Ingram in this political contributions scheme, but also she directed Kelly and Haddle to rectify the false Medicare cost reports when the scheme was about to be exposed.

---

[25] Given the extensive involvement in this Medicare fraud crime of Noel O'Neal Ingram, a member of the State Bar of Georgia, the Clerk is directed to provide a copy of this opinion to the Office of the General Counsel of the State Bar of Georgia for the purpose of determining whether this unindicted coconspirator is fit for continued membership in the Georgia Bar.

As defined by the application notes for section 3B1.1, Ingram was a participant in Garrison's fraud on the Medicare program through the political contributions scheme, and her conduct was directed, managed and supervised by Garrison.  See  U.S.S.G. § 3B1.1, comment. (n.1-2).   Furthermore, Garrison instructed Kelly and Haddle to remedy Healthmaster's false cost reports to Medicare to avert detection of the four-year political contributions scheme.  We conclude that the district judge properly  imposed  a two-level enhancement in Garrison's sentence under section 3B1.1(c) for her aggravating role as an organizer and leader  in the political contributions scheme to defraud Medicare because this determination  is supported by a preponderance of the evidence.  See United States v. Stanley, 24 F.3d 1314, 1323 (11th Cir. 1994).

C. Fine

1. Notice

Garrison complains that she did not receive adequate notice that the district judge would depart upward in imposing her fine in

the amount of $2,500,000[26] in accordance with Burns v. United States, 501 U.S. 129, 138-39, 111 S.Ct. 2182, 2187 (1991); United States v. Paslay, 971 F.2d 667, 673-74 n.11 (11th Cir. 1992). Under Burns, the district court must give "reasonable notice" that it is contemplating an upward departure in the  sentencing range established by the Sentencing Guidelines.  Burns, 501 U.S. at 138, 111 S.Ct. at 2187.  "This notice must specifically identify the ground on which the district court is contemplating an upward departure." Id. at 138-39, 111 S.Ct. at 2187.  Our court has held that Burns requires that the notice "must affirmatively indicate that an upward departure is appropriate based on a particular ground" and that the defendant must be provided with notice "setting forth the potential ground (or grounds) for the upward departure within a 'reasonable' amount of time prior to the sentencing hearing."  Paslay, 971 F.2d at 673-74 n.11.

---

[26] Based on Garrison's total offense level of 20, which included the two-level enhancement for abuse of trust that we have determined to be incorrect, her fine range would have been $7,500 to $75,000.  U.S.S.G. § 5E1.2(c)(3). Our elimination of the abuse-of-trust enhancement, however, does not affect our decision to uphold the fine, which is based on independently justifying reasons.

Garrison concedes that her attorney received the revised PSR containing notice of the possibility of upward departure on October 20, 1995, which was six days before sentencing on October 26, 1995. Appellant's Brief at 42. This notice advised: "The Court may consider an upward departure from the stated guideline fine range because the defendant profited substantially from her involvement in the offense and the sale of the company."[27] Revised PSR at 16, ¶ 63 (Oct. 19, 1995).[28] Garrison acknowledged the notice of a

---

[27] Under her plea agreement, Garrison was to sell Healthmaster to an independent party and to use the proceeds to pay $11,500,000 in restitution to Medicare and Medicaid. See R1-331-5; PSR at 5, ¶ 10. A contract for the sale of Healthmaster for $54,740,000 was scheduled for closing on November 1, 1995. After payment of costs, taxes, and creditors, Garrison and her family were to receive between $14,200,000 and $18,000,000 from the sale.

[28] We note that this revised PSR was not in the record on appeal, although both parties quote the same recommendation for upward departure in Garrison's fine that we quote concerning the issue of notice. See Appellant's Brief at 42; Appellee's Brief at 34. Since adequate notice of upward departure in Garrison's fine is an issue on appeal and this revised PSR was the notice, it was incumbent upon the parties in preparing the record on appeal to be certain that this revised PSR, essential to our review of the notice issue with respect to the fine, was part of the appellate record. Instead, this court had to obtain this revised PSR, which both parties acknowledge receiving six days prior to the sentencing hearing, from the probation office. We are disappointed by the lack of diligence shown by the parties in this case in preparing the record on appeal. It is the responsibility of the parties to work with each other and the clerk's office to ensure that the record on appeal is complete for our review of the appellate issues.

potential upward departure in her fine and challenged the rationale

that she would profit from the sale of Healthmaster in her

sentencing memorandum:

> On Friday morning, October 20, [Garrison's] counsel received an amendment by the probation office to the presentence report. The amendment suggested the possibility of an upward departure on the fine range because [Garrison] "profited substantially from . . . the offense and the sale of the Company." This is incorrect. In the sale of the company, the state and federal governments are receiving $9M more in repayments than they are owed plus $10M in taxes. Any funds remaining after the payment of creditors are serendipitous and will benefit the trusts of the Garrison children. The incremental benefit to Garrison companies from political contributions and shared services is being repaid many times over.

R1-421-25 n.1.[29]

---

[29] Garrison's sentencing memorandum, dated October 20, 1995, also was not part of the record on appeal, although the government quotes the same footnote in its brief. <u>See</u> Appellee's Brief at 35. In the course of our appellate review, the district court, at our request, obtained Garrison's sentencing memorandum and docketed it for the first time as received there on November 24, 1997; our court did not receive Garrison's sentencing memorandum until December 5, 1997. Whatever inadvertence caused Garrison's sentencing memorandum not to have been docketed previously in the district court and, consequently, not to be part of the original record in this case, we know that it was received by the government, which filed a response, R1-330, prior to Garrison's sentencing and that it was reviewed by the district court because it is referenced in the sentencing transcript, R4-4. Accordingly, we have considered Garrison's sentencing memorandum and the representations therein. We reiterate, however, that it is the responsibility of the parties to see that the appellate record is complete and that documents from which

At sentencing, Garrison's counsel confirmed that he had no objections "as to the factual accuracy" of the PSR but that he did "dispute some of the conclusions legally." R4-4. Garrison, who had filed a statement that she had "read, reviewed and under[stood] the presentence report," R1-326-1, agreed with her counsel's representations at sentencing, R4-4. After Garrison's counsel presented witnesses on her behalf, the district judge asked Garrison if she wanted to speak, but she declined, and her attorney announced that they were ready to proceed with the sentencing. Id. at 91. The district judge asked counsel if there was "any reason why I should not now proceed with the imposition of sentence?" Id. at 92. Garrison's counsel responded: "There is no reason, Your Honor." Id.

The district judge then imposed Garrison's sentence, including the $2,500,000 fine. Her counsel did not object to the fine when it was imposed, and the district judge went on to address supervised

they quote on appeal were docketed in the district court and are part of the record on appeal.

47

release, dismissal of the remaining counts of the indictment, arrangements for Garrison's surrender, and her right to appeal. Thereafter, the district judge asked if Garrison's counsel had "any objection to the Court's finding of fact and conclusions of law or to the manner in which sentence was pronounced?" R4-97. The following colloquy ensued between Garrison's counsel and the sentencing judge:

> COUNSEL: Your Honor, to preserve the record, we do object on the abuse of trust and role in the offense.
> Additionally, although not argued to you today, we footnoted in our sentencing memorandum our objection to an upward departure in the fine level which the Court has imposed here.
>
> THE COURT: Yes.
>
> COUNSEL: And we would state that we respectfully do not believe that the record reflects that the elements for such an upward departure exist in this case.
> And therefore, we wish to preserve our appellate issues on that.
>
> THE COURT: Certainly. All right. That is the judgment of the Court.

Id.

Because Garrison acknowledges that she received notice of

the possibility of upward departure in her fine six days prior to her sentencing in the revised PSR, she objected to an upward departure in her sentencing memorandum, and she relied on that objection at sentencing, we conclude that she received reasonable notice of the potential of upward departure in her fine. She acted upon this notice in her responsive sentencing memorandum and was content to rely upon her footnote response in that memorandum at sentencing, although the district judge gave her counsel the opportunity to object at sentencing following his statement of the reasons for the upward departure in the fine. Since the district judge based his reasons for the upward departure in Garrison's fine on facts found in the PSR, which Garrison asserted to the court that she had reviewed, understood, and accepted as accurate, she cannot now contrariwise represent that she was unprepared for or surprised by the reasons upon which the district judge based the upward departure.[30]

_____

[30] The lack-of-notice cases relied upon by Garrison are inapposite because either the PSR did not indicate the possibility of an upward departure or did not specify the reason for an upward departure. See Burns, 501 U.S. at 131-32, 111 S.Ct. at 2184 (holding that the district court violated Fed. R.

Federal Rule of Criminal Procedure 32(c)(1) requires only that the district judge give counsel "an opportunity to comment on the probation officer's determinations and on other matters relating to the appropriate sentence." Fed. R. Crim. P. 32(c)(1); see U.S.S.G. § 6A1.3(a), p.s. ("When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor.") .[31]  Moreover, Garrison admits that she "did not object

Crim. P. 32 by departing upward in sentence without notice and the PSR identified no grounds for departure); United States v. Valentine, 21 F.3d 395, 397-98 (11th Cir. 1994) (involving government concession of Burns violation where basis for upward departure was not mentioned until sentencing); United States v. Jones, 1 F.3d 1167, 1168 (11th Cir. 1993) ("The PSI did not suggest that an upward departure would be considered, and before the hearing the government made no such suggestion."); Paslay, 971 F.2d at 673 n.11 ("[T]he presentence investigation report did not put [the defendant] on notice that an upward departure . . . would be considered."); United States v. Wright, 968 F.2d 1167, 1173 (11th Cir. 1992) (per curiam) ("[T]he PSI did not recommend an upward departure; nor did the Government present the court with a prehearing submission recommending an upward departure."), vacated on other grounds, 508 U.S. 902, 113 S.Ct. 2325 (1993). In contrast, Garrison was notified in the revised PSR, which she received six days prior to her sentencing, of the potential upward departure in her fine because of her substantial profits resulting from her involvement in the crimes to which she pled guilty and the sale of the company. While the district judge elaborated on these reasons for the upward departure at sentencing, they nevertheless were the bases for the upward departure for which Garrison was prepared by the notice in the revised PSR.

[31] Sentencing Guidelines policy statements are binding on federal courts as interpretive guides to the meaning of an applicable guideline.  Williams v. United States, 503 U.S. 193,

specifically to the lack of notice under <u>Burns</u> at the sentencing hearing and therefore the standard of review is plain error." Appellant's Brief at 42 n.7 (citing <u>United States v. Jones</u>, 1 F.3d 1167, 1170 (11th Cir. 1993); <u>see</u> <u>Paslay</u>, 971 F.2d at 674 n.13 (stating that, for sentencings after <u>Burns</u> issued, "<u>Burns</u> notice will be subject to waiver and limited review under the plain error rule when a defendant fails to make a timely objection predicated on <u>Burns</u> in district court").   When sentence objections are raised for the first time on appeal, we consider them "under the plain error doctrine to avoid manifest injustice." <u>United States v. Stevenson</u>, 68 F.3d 1292, 1294 (11th Cir. 1995) (per curiam).  For our court "to correct plain error: (1) there must be error; (2) the error must be plain; and (3) the error must affect substantial rights."  <u>Id.</u>

We conclude that her revised PSR, received six days prior to her sentencing, was reasonable notice to Garrison of the potential for upward departure in her fine.  The sufficiency of this notice is evidenced by her responsive sentencing memorandum, which she

200-01, 112 S.Ct. 1112, 1119 (1992); <u>Stinson</u>, 508 U.S. at 42, 113 S.Ct. at 1917.

determined to be adequate to preserve her objection at sentencing after pronouncement of the fine. Furthermore, she should not have been surprised by the reasons for the upward departure, which were based on the facts of the PSR. There was no plain error regarding notice of the upward departure in Garrison's fine.

2. Upward Departure

Garrison argues that the district judge used improper factors in upwardly departing in the imposition of her fine from the Guidelines range of $7,500 to $75,000 , U.S.S.G. § 5E1.2(c)(3). She contends that her $2,500,000 fine "is so large and disproportionate to the offense that it is unreasonable on its face." Appellant's Brief at 49. We review a district court's departure from the applicable Sentencing Guidelines for abuse of discretion, and that decision is entitled to "substantial deference ." Koon v. United States, ___ U.S. ___, ___, 116 S.Ct. 2035, 2046 (1996).

The Sentencing Guidelines mandate that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any

fine." U.S.S.G. § 5E1.2(a); see United States v. Hairston, 46 F.3d 361, 376 (4th Cir. 1995) ("The defendant bears the burden of demonstrating his present and prospective inability to pay [a fine]."), cert. denied, ___ U.S. ___, 116 S.Ct. 124 (1995).  After a sentencing court determines that a fine is appropriate, it then is required to consider "seven factors in setting the amount of the fine, including the evidence presented as to the defendant's ability to pay."  United States v. Lombardo, 35 F.3d 526, 527 (11th Cir. 1994) (per curiam).  Under the Sentencing Guidelines, those factors that the district court must consider  to determine  the amount of a fine are:

> (1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

> (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

> (3) the burden that the fine places on the defendant and his dependents relative to alternative punishments;

(4) any restitution or reparation that the defendant has made or is obligated to make;

(5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;

(6) whether the defendant previously has been fined for a similar offense; and

(7) any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d). Although we have not required that the district court make specific findings concerning each of these factors, we need the court's reasoning or sufficient record evidence to show consideration of these factors for our review. Lombardo, 35 F.3d at 529-30. We have recognized that the amount of a fine can be based on a defendant's role in the criminal conduct, the likelihood that prior income was derived predominantly from the criminal activity, "and the district court's realistic assessment of the defendant's personal ability to pay." United States v. Nelson, 837 F.2d 1519, 1526 n.4 (11th Cir. 1988). Since these factors must be considered with the imposition of any fine, they comprise the foundation for the fine determined by the sentencing court from which the district court in this case additionally departed upward.

The Sentencing Guidelines anticipate the potential for upward departures in fines in particular cases where the Guideline range is insufficient:

> The Commission envisions that for most defendants, the maximum of the guideline fine range from subsection (c) will be at least twice the amount of gain or loss resulting from the offense. Where, however, two times either the amount of gain to the defendant or the amount of loss caused by the offense exceeds the maximum of the fine guideline, <u>an upward departure from the fine guideline may be warranted.</u>

U.S.S.G. § 5E1.2, comment. (n.4) (emphasis added).

In <u>Koon</u>, the Supreme Court established the analysis for determining whether a particular Guidelines departure is justified:

> 1) What features of this case, potentially, take it outside the Guidelines' "heartland" and make of it a special, or unusual, case?
>
> 2) Has the Commission forbidden departures based on those features?
>
> 3) If not, has the Commission encouraged departures based on those features?
>
> 4) If not, has the Commission discouraged departures based on those features?

<u>Koon</u>, ___ U.S. at ___, 116 S.Ct. at 2045 (citation and internal

quotation marks omitted).

At sentencing, the district judge explained his reasoning for imposing Garrison's sizeable fine:

The Defendant shall pay the United States a fine of two hundred and fifty thousand dollars on each of Counts 1 through 10, for a total fine of two million, five hundred thousand dollars.

And that fine has been imposed in a sense as an upward departure from the fine guideline range. In deciding to depart upward, I, of course, considered and had to consider many factors:

First, the Court wants to be sure that the combined sentence reflects the seriousness of the offense and that it promotes respect for the law;

In addition, that it provides a just punishment under all the facts;

And finally, and most importantly, as has been pointed out by counsel, affords an adequate deterrence.

In addition, I have evaluated the Defendant's ability to pay the imposed fine and the possibility that it would impose a burden on her or her dependents. The information, however, provided and contained in the Presentence Report has shown that she does have significant financial resources to pay the fine and that she has provided a trust and numerous business opportunities for her dependents which should provide them with ample financial security for the balance of their lives.

I have chosen the fine amount to reflect the intent of the Sentencing Commission as stated in Section 5E1.2 in the application note number four, which states that if two times the amount of loss exceeds the maximum of the fine guideline, an upward departure may be

warranted.  And the <u>amount of  loss in this case, of course, greatly exceeded that maximum and fully authorizes the fine that the Court has imposed.</u>

As has been commented repeatedly, this is a very high profile case.  In these times, not only because of this case, but we hear continually the <u>public's concern about the Medicare program and the possibility of losing medical benefits in old age</u>.

And I think it would be reasonable to assume that the public sees the <u>Defendant as a person who has violated the law, and as a result, made very substantial profits for herself and her family even after restitution and other civil obligations have been paid</u>.

So <u>to impose a fine less than the maximum allowed by statute could cause the public to lose respect for the courts and the judicial process,</u> something that becomes involved and is involved in the imposition of any sentence by this Court.

R4-93-95 (emphasis added).   We affirm a "district court's

determination of the facts supporting an upward departure unless

that determination was clearly erroneous."[32]  <u>United States v.</u>

<u>Gunby</u>, 112 F.3d 1493, 1503 (11th Cir. 1997).

---

[32] The district court's factual findings concerning the § 5E1.2(d) factors in determining a fine is reviewed under the clearly erroneous standard and is to be distinguished from our abuse-of-discretion review of the district court's decision to depart upward.  See <u>Long</u>, 122 F.3d at 1366; <u>Lombardo</u>, 35 F.3d at 527; <u>see also</u> <u>United States v. Rowland</u>, 906 F.2d 621, 623 (11th Cir. 1990) (recognizing that, because a district court's determination of the appropriate fine involves factual issues, "including the defendant's ability to pay the fine imposed,"the district court's calculation of the fine is entitled to deference and can be reversed on appeal only for clear error).

Garrison conceded the factual accuracy of the PSR, which states that "[t]he minimum amount of intended loss to have been suffered by Medicare as a result of Garrison's activity is $1,192[,]440.21," PSR at 5, ¶ 9, and that "Medicare suffered a direct loss of a minimum of $743,397.49 in the instant offense," id. at ¶ 10 .[33] The application commentary to the fraud guideline, under which Garrison was sentenced, states that "[c]onsistent with the provisions of § 2X1.1 (Attempt, Solicitation or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1, comment. (n.7). Garrison pled guilty to conspiracy in addition to nine false statement counts. A minimum intended loss of approximately $1,200,000 is almost sixteen times $75,000, which is the maximum of the Sentencing Guidelines fine range on each count. Even the direct loss in excess of $743,000 was nearly ten times $75,000.

---

[33] As the PSR recommended, the district judge increased Garrison's base offense level by eleven levels under U.S.S.G. § 2F1.1(b)(1)(L), which corresponds to a loss of more than $800,000 but less than $1,500,000. See PSR at 6, ¶ 16.

The Sentencing Guidelines provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." U.S.S.G. § 5E1.2(e). Garrison's net worth, stated in her PSR, which she agreed at sentencing was accurate, was $46,483,011. PSR at 11. She was to make an estimated $14,000,000 from the sale of Healthmaster after all of her obligations to the government and the company's creditors were paid. Over ninety percent of Healthmaster's business was reimbursed by Medicare, which Garrison had bilked for years to cover her and her family's personal expenses, her employees' salaries for non-Medicare work, and even political contributions. Additionally, Garrison agreed and understood pursuant to her plea agreement that "the question of fine will ultimately be within the Court's discretion, in accordance with the Sentencing Guidelines." R1-331-4. The record evidences that these facts that support the district judge's upward departure are not clearly erroneous.

In departing upward in Garrison's fine, the district judge

specifically relied on the Sentencing Guidelines application commentary, providing that "[w]here . . . two times either the amount of gain to the defendant or the amount of loss caused by the offense exceeds the maximum of the fine guideline, an upward departure from the fine guideline may be warranted." U.S.S.G. § 5E1.2, comment. (n.4)[34]; see United States v. Leonard, 67 F.3d 460, 461 (2d Cir. 1995) (per curiam) (deciding that the district court's "reliance on § 5E1.2 Application Note 4 . . . was adequate to justify the departure"). Determining that the maximum Sentencing

---

[34] Garrison mistakenly argues that the district court could not have departed on the stated basis from U.S.S.G. § 5E1.2, comment. (n.4), because that application note also provides that "where a sentence within the applicable fine guideline range would not be sufficient to ensure both the disgorgement of any gain from the offense that otherwise would not be disgorged (e.g., by restitution or forfeiture) and an adequate punitive fine, an upward departure from the fine guideline range may be warranted." Id. Garrison contends that she has paid $16,500,000 in restitution and that "there is no factual finding that $16,500,000.00 was a loss or gain attributable to [her]." Appellant's Brief at 52. Whatever Garrison's agreements are with the trustee in bankruptcy for Healthmaster and the nature of the additional $5,000,000 payment that she claims that she has made, in her plea agreement, Garrison knowingly and voluntarily agreed to pay $11,500,000 as "full and complete restitution," $10,000,000 to Medicare and $1,500,000 to Medicaid, for losses attributable to her and her companies. R1-331-5. Furthermore, in the provision in the second paragraph of § 5E1.2, comment.(n.4), upon which Garrison relies, the Sentencing Commission "sought to state an additional basis for departure, not to narrow the terms of the departure authorized in the first paragraph." United States v. Leonard, 67 F.3d 460,462 (2d Cir. 1995) (per curiam).

Guidelines fine of $75,000 was inadequate and, therefore, an upward departure was warranted under section 5E1.2, comment. (n.4), the district judge calculated Garrison's fine pursuant to her plea agreement, wherein she agreed that she was subject to a fine not to exceed $250,000 on each of the ten counts to which she pled guilty, R1-331-9, 10.[35] This calculation complies with 18 U.S.C. § 3571(b)(3).[36]

Additionally, Garrison selectively quotes out of context from the district judge's reasons for the upward departure in her fine to argue that the judge improperly based the departure on her "socio-economic status" and "publicity." Appellant's Brief at 50, 51. When viewed in context of his reasons for the upward departure in

---

[35] Garrison pled guilty to Count One for conspiracy to defraud the United States in violation of 18 U.S.C. § 371 and Counts Two through Ten for false statements to Medicare in violation of 18 U.S.C. § 1001.

[36] Under 18 U.S.C. § 3571(b)(3), the maximum to which a defendant may be sentenced per felony is $250,000. Garrison incorrectly argues that her $2,500,000 fine violates 18 U.S.C. § 3571(d), which alternatively limits a defendant's fine based on pecuniary gain or loss to "not more than the greater of twice the gross gain or twice the gross loss." 18 U.S.C. § 3571(d). Garrison fails to recognize that § 3571(d) is an alternative method of calculating a defendant's fine and that it does not preclude a fine under § 3571(b)(3). See 18 U.S.C. § 3571(b)(2).

her fine, it is clear that the district judge was stating on the record that he had considered the requisite factors of U.S.S.G. § 5E1.2(d) in determining the fine portion of Garrison's sentence. See 18 U.S.C. § 3553(a) (listing the factors to be considered in imposing sentence). Rather than imposing the fine based on Garrison's affluence, as she contends,[37] the district judge determined the fine for Garrison's substantial fraud on the Medicare program, from which she and her family profited greatly and to which she pled guilty. Garrison's greed, reflected in the considerable amount of her Medicare fraud over a number of years, was the basis for her fine. The district judge assessed her ability to pay the fine in

---

[37] We reject Garrison's self-serving arguments attempting to show that the district judge based her fine on her socio-economic status as a misrepresentation of the facts and the judge's reasoning in imposing her fine:

> Simply because a party engages in limited criminal activity which may result in an illegal gain, it does not follow that all other income from a business is not legitimately earned. Clearly, the trial court impermissibly increased Garrison's fine based upon the wealth and socio-economic status she and her family achieved through 20 years of building a business. This business legitimately earned, and is entitled to retain, the vast majority of its profits.

Appellant's Brief at 51. The record evidence in this case shows that Healthmaster predominately was funded by Medicare, which was defrauded at Garrison's direction of considerable funds.

addition to restitution as he is required to do.  See U.S.S.G. §

5E1.2(d)(2)-(4) (requiring a sentencing judge to consider ability to

pay, burden placed on dependents, and restitution before

determining a fine amount).

Similarly, Garrison incorrectly attributes the amount of her fine

to publicity or notoriety surrounding her case as being a motivating

factor for the upward departure by the district judge.[38]

Contrary to her mischaracterization of publicity as a reason for the

upward departure, the judge stated at sentencing that there was

public concern regarding Medicare fraud and its impact on the

Medicare program.  From a punitive perspective, the judge also

stated that the public would lose respect for the judicial process if a

criminal who had profited substantially from a federal health

---

[38] Garrison's publicity argument as it relates to her fine is as follows:

> All defendants should be sentenced fairly and equally based on their conduct, not on the amount of publicity that their case has generated.  Sentencing decisions based upon the notoriety of a particular defendant are inherently unfair and contrary to the purposes of our justice system.  Publicity is an unreasonable basis for a departure from the sentencing guidelines and should not be allowed.

Appellant's Brief at 49-50 (emphasis added).

insurance program did not receive a commensurate sentence. In determining a fine, a sentencing judge is required to consider "the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence." U.S.S.G. § 5E1.2(d)(1). Given Garrison's substantial profits over time from her Medicare fraud, the district judge did not believe that the highest Sentencing Guidelines applicable fine was sufficient to punish Garrison's calculated crime that defrauded Medicare, our federal, public health insurance program. Where the amount of loss "does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted," such as when "the offense caused a loss of confidence in an important institution." U.S.S.G. § 2F1.1, comment. (n.10)(e); see Gunby, 112 F.3d at 1502 (determining that the district court did not abuse its discretion in departing upward in sentence after concluding that the defendant's fraudulent schemes "significantly disrupted a

governmental function"). Thus, sufficient punishment for her Medicare fraud and deterrence of such conduct were behind the public concern factor for the district judge's decision to depart upward in Garrison's fine and not publicity.

Applying the Koon analysis to the district judge's upward departure in Garrison's fine, we find that the judge's explanation was compliant. The district judge enunciated at sentencing his evaluation of the factors required under the Sentencing Guidelines before the imposition of any fine. See U.S.S.G. § 5E1.2(d). He particularly was impressed by the considerable amount that Garrison and those at her direction defrauded the Medicare program over a period of twenty years, and he carefully assessed Garrison's ability to pay the fine imposed, which she has not disputed. For defrauding our federal health insurance program for her personal gain as well as contributions to political candidates, the district judge determined that Garrison's criminal conduct was especially egregious and warranted an upward departure from the highest amount under the Guidelines range. Far from forbidding

such a departure, the Sentencing Commission specifically provided for it as U.S.S.G. § 5E1.2, comment. (4) and U.S.S.G. § 2F1.1, comment. (n.10) clarify. Significantly, the $2,500,000 fine also was available under 18 U.S.C. § 3571(b) (3), which permits a fine of $250,000 per felony for a defendant. Furthermore, Garrison's argument that her restitution amount precluded her sizeable fine is unavailing because she agreed in her plea agreement to pay $11,500,000 in restitution as well as a fine to be determined by the district judge. Accordingly, we conclude that the district judge did not abuse his discretion in departing upward in Garrison's fine.

### III. CONCLUSION

In this appeal from her Medicare fraud sentence, Garrison argues that her sentence should not have been enhanced for abuse of a position of trust and role in the offense. She also contends that she did not have sufficient notice concerning the district court's upward departure in her fine and that the amount was unjustified. The district court appropriately enhanced Garrison's sentence for her aggravating role in the offense and her

fine was not an abuse of discretion.  Nevertheless, we VACATE

Garrison's sentence because the enhancement for abuse of a

position of trust was improper, as we have explained herein.

Accordingly, we REMAND for resentencing with instructions that

the district court eliminate the enhancement for abuse of a position

of public trust.