138 F.3d 928
 Medicare & Medicaid Guide P 46,209,
49 Fed. R. Evid. Serv. 237,
11 Fla. L. Weekly Fed. C 1197
UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,
v.
Margie B. MILLS, Defendant-Appellant,
Robert Jack Mills, Defendant-Appellant, Cross-Appellee.
 No. 96-8594.
 United States Court of Appeals,
Eleventh Circuit.
 April 10, 1998.
 
 James K. Jenkins, W. Bruce Maloy, Maloy & Jenkins, Atlanta, GA, for R. Mills.
 John J. Ossick, Jr., Kingsland, GA, Scott Srebnick, Miami, FL, for M. Mills.
 Harry D. Dixon, U.S. Atty., Thomas A. Withers, Asst. U.S. Atty., Savannah, GA, Thomas M. Gannon, Appellate Section, Criminal Division, Dept. of Justice, Washington, DC, for United States.
 Appeals from the United States District Court for the Southern District of Georgia.
 Before HATCHETT, Chief Judge, and EDMONDSON and COX, Circuit Judges.
 COX, Circuit Judge:
 
 
 1
 Robert J. ("Jack") Mills and his wife, Margie B. Mills,[1] appeal their convictions and sentences for false statements, mail fraud, Medicare fraud, and witness tampering. We affirm their convictions and vacate their sentences. The Government cross-appeals the district court's post-trial judgment of acquittal on several mail fraud counts against Jack. We reverse.
 
 I. FACTS
 
 2
 The Millses were officers and majority shareholders of a Medicare services provider, ABC Home Health Services, Inc., which later became First American Health Care of Georgia, Inc.[2] Over several years they used their positions to cheat the Medicare program out of millions of dollars. A reasonable jury could have found the following facts true based on the evidence. Some detail is necessary because of the harmless-error and sufficiency-of-the-evidence issues that are presented.
 
 A. Background
 
 3
 The Medicare home-health care system has three players. First, care providers such as First American care for patients in exchange for reimbursement of their reasonable patient care-related expenses. The second player, the fiscal intermediary, holds the purse strings to reimbursement funds under contract with the third player, the Health Care Financing Administration, a government agency. Fiscal intermediaries, like providers, are entitled only to return of their costs in exchange for their services. Aetna Life Insurance Company was First American's intermediary during most of the time period relevant here.
 
 
 4
 Providers generally receive biweekly payments in an amount based on quarterly figures of how many patients the provider has visited and how much each visit cost. At year end, providers submit an annual "cost report" for a true-up with the sum of these interim payments. If the total interim payments exceed the provider's actual allowable expenses as determined by the cost report, the provider owes the intermediary money. If, on the other hand, the provider's actual allowable expenses surpass the total periodic payments, the intermediary pays the provider. In practice, Aetna subjected First American's cost reports to a detailed audit, and this true-up for years as far back as 1990 was incomplete at the time of trial.
 
 
 5
 Jack brought a businessman's outlook to this cost-based system. He dreamt of making First American profitable, a goal impossible in the current program. Jack also enjoyed the perquisites, such as corporate airplanes and golf retreats, that First American's growth brought, and according to every witness but him, he ran First American as an autocratic founder. Jack naturally bridled at Aetna's audits and intrusion, believing that Aetna was "telling him how to run his business." (R.31 at 236.). He judged the auditors to be "more dangerous than a punk with a gun." (R.37 at 281.)[3] When Aetna obtained potentially damaging information from First American, which had to keep its books open for audit, Jack memoed employees that when he "f[ou]nd out which person or persons are involved in passing out First American confidential information, they better give their heart and soul to God because I will sure own every part that is left." (R.32 at 68.) At a leadership conference speech to First American employees, shown at trial on videotape, he boasted of "challenging" "the feds" and breaking the rules. (R.41 at 480.)
 
 
 6
 Not surprisingly, First American and Jack had a history of disputes with fiscal intermediary auditors. In the mid-1980s, disputes arose between Blue Cross and Blue Shield of Georgia, then First American's auditor, over Jack's use of airplanes to get around; Jack took the position that his family life warranted the substantial additional expense to Medicare. In 1988, First American fought its assignment to Aetna as its intermediary, going so far as to petition Congressmen. In 1989, Aetna threatened to withhold interim payments because First American had denied access to records. In 1990, Aetna reported First American to the Office of the Inspector General because of perceived irregularities and withheld interim payments because of a sudden and unexplained increase in costs. In 1991, Aetna disallowed salaries paid to former Georgia senator Bill English and Atlanta City Council member Ira Jackson because they related not to patient care, but to marketing and agency acquisition costs. Jack's attitude, these conflicts with Aetna, and chronic cash-flow problems perhaps led Jack and First American to develop sophisticated schemes to disguise questionably reimbursable expenses as reimbursable. The schemes involved five categories of expenses.
 
 B. The Schemes
 
 7
 1. Personal Use of Medicare-Reimbursed Airplanes
 
 
 8
 First American owned, leased, or borrowed several airplanes, including a $2.8 million King Air jet, that its executives used for business travel. Aetna policies did not prohibit reimbursement of the corporate airplane costs. Aetna was skeptical, however, that corporate planes were a fiscally prudent way to fill First American's travel needs. In 1990, following the purchase of the King Air, Aetna agreed nonetheless to reimburse First American for its plane installment payments, provided that at least 90% of the plane's flight time was reimbursable, patient care-related travel. Aetna also consented to reimburse expenses such as maintenance and pilot salaries prorated to the percentage of time spent on business travel. In 1991, Aetna demanded and First American agreed to provide further documentation of the planes' use so that Aetna could measure the reimbursable use of the planes. That documentation included records of the purpose, passengers, length, and destination of every flight.
 
 
 9
 During and after these discussions with Aetna, Jack and Margie took First American planes on dozens of personal trips--twelve round trips alleged in the indictment, 72 total found by investigators--that included visiting their mothers, sunning in Cozumel, viewing prefab columns in Dallas that they wished to incorporate into their new mansion, and attending their high school reunions and sports events like Auburn University football games.[4] They also transported non-First American-related passengers, including their children, both Millses' mothers, then-Governor of Alabama Jim Folsom, Georgia Speaker of the House Tom Murphy, and University of Georgia football coach Vince Dooley.
 
 
 10
 The costs allocable to this personal use would not have been reimbursable, of course, under the arrangement with Aetna. If this use rose over 10% of total flying time, moreover, it threatened reimbursement for the King Air payments. First American, at Jack's direction and with the cooperation of the chief pilot, Jim McManus, therefore undertook to disguise and conceal personal use. They used several methods. First, passengers with no business purpose for traveling would not appear on passenger manifests--so-called "ghost passengers." Second, pilots would pull a circuit breaker to prevent the planes' hour meter from adding the flight time during personal flights to the planes' total flight time; thus, these "breaker" or "ghost" flights would not lower the percentage of patient care-related flight time. Many breaker flights left no trace in company records, although First American employees would schedule the flights on Post-Its, some of which were in evidence, inserted in the airplane schedule book. Other breaker flights were listed in the company flight log with false or omitted destinations. Yet another method for concealment had pilots pad their Medicare-reimbursable expense reports with extra meals to recover expenses incurred during these "breaker flights." First American rounded out the scheme in 1991 meetings with Aetna auditors about documentation; there, Jack and First American's counsel, Wayne Phears, denied knowing of "breaker flights"[5] and indeed berated Aetna for not trusting First American's records.
 
 2. Kickbacks on Aviation Fuel Purchases
 
 11
 First American purchased most of its fuel and leased hangar and office space from Golden Isles Aviation, Inc., on St. Simons Island. For some time, Golden Isles had discounted the fuel sold to First American because of the volume purchased. When First American leased new hangar and office space, however, the companies struck a new deal. Golden Isles would continue to charge less for the fuel First American purchased according to a volume-based stepped percentage. But the difference between retail and First American's price would go into a rebate account with Golden Isles. Golden Isles initially applied the rebate account to renovation costs for First American's hangar, but later the rebates went to pay other maintenance expenses. Jim McManus would typically present invoices to Golden Isles to be paid out of the rebate account, or he would charge bills on a credit card paid by Golden Isles out of the rebate account. Checks from this account also reimbursed Jack for fuel he bought for some personal flights; thus, although it would appear that Medicare was not fueling the flights, through the rebate mechanism it was.
 
 
 12
 First American and Jack never disclosed this arrangement to Aetna. Rather, First American reported the full fuel cost as part of its travel expenses. Thus, First American had the advantage of using the rebate money without having to justify the relation between the expenditures and patient care.
 
 3. Lobbying Expenses
 
 13
 Medicare reimburses providers only their actual costs for patient care. Thus, Medicare providers cannot make a profit. A legislative proposal exists, however, that would change this system. Under the proposal, called the "prospective payment system," or "PPS," providers would receive a flat fee for patient care. Hence, an efficient provider--or one that successfully inflated the baseline costs on which the flat fee rested--could realize a profit. As Jack explained in a speech to First American employees, with PPS First American could go public and make lots of money.
 
 
 14
 For this reason, Jack hired lobbyists to promote PPS. Some were politicians such as former Georgia senator Mack Mattingly, whom First American hired as a "consultant" to introduce Jack to influential lawmakers and to exploit his connections for First American's benefit. Others were full-time, professional lobbyists. One of these was Paul Berry, a former roommate of President Clinton's. First American hired Berry, a federally registered lobbyist, in 1992 and 1993. Although nominally a "consultant," Berry in fact lobbied for First American. For example, he memoed Jack a recitation of his progress in persuading lawmakers of PPS's advantages. And Jack himself described Berry's job as help with the "project" of "get[ting] prospective pay" so that First American could go public. (R.41 at 483.) Furthermore, Berry's functions included introducing the Millses to Capitol Hill staffers and members of President Clinton's newly formed health care task force. Another lobbyist was Steve Clark, a former attorney general of Arkansas and friend of President Clinton's, who was hired as a "vice president of managed care." Clark was well connected and succeeded in getting Jack into a foursome with Donna Shalala, Secretary of Health and Human Services, at a charity golf tournament in Texarkana.
 
 
 15
 In addition to exploiting their networks, Clark and Berry worked hand-in-glove with two Washington lobbying firms--one Democrat and one Republican--Global USA and the Borden Group. Together, they orchestrated a large First American campaign focused on changing certain proposed legislation. This campaign included television advertisements that were facially for nurse recruitment, but were in fact intended to influence congressmen at home during recess. The drive also involved a mass distribution of a pro-PPS position paper to First American employees with the instruction for them to retype it and send it as a "letter to the editor" to their local papers. Some of this lobbying activity was nominally for the American Federation of Home Health Agencies, an organization that Jack claimed to control.
 
 
 16
 Lobbying costs are not reimbursable. First American's lobbying expenses were therefore reported on First American's cost reports as consulting expenses, which are reimbursable. There was no mistake here: Borden Group bills were indeed originally taken off First American's cost report by First American's reimbursement department. At Jack's direction, however, the bills were claimed on the report. And these misrepresentations were backed up by well-engineered paperwork. For instance, the check request generated to pay Mattingly's fee for introducing Jack to important politicians showed the purpose of the check as "consulting fee for matters relating to existing regulations"--an arguably reimbursable cost. All the contracts with the other lobbyists were couched in "consulting agreement" terms; Berry's contract in fact forbade him from lobbying.
 
 4. Political Contributions
 
 17
 In June 1991, during a Georgia gubernatorial campaign, Jack pressured seven First American executives to attend a Zell Miller fundraiser. In fact, one executive, William Edwards, was called from vacation in the midst of home-moving and asked to attend the function. All seven executives made $500 contributions, which were then reimbursed by way of "bonuses" that were reported to Aetna as reimbursable salary expense. Jack testified that the contributions were purely coincidental to the bonuses, but there was no evidence that any executive who had not made a contribution received a $500 bonus at this time. When a similar scheme led to a federal indictment against another Medicare company, Jack told the worried executives that Georgia Attorney General Michael Bowers had provided First American immunity from prosecution for its actions. Bowers, who testified at trial, denied ever granting immunity to any First American-related person.
 
 
 18
 On two prior occasions, attempts to force lower-level employees to make campaign contributions were defeated by First American executives. In one, Jack sought to have First American's Florida employees contribute $100 apiece to the Lawton Chiles campaign, to be reimbursed by adding mileage to expense reports. Jack ultimately withdrew this request, persuaded by a Florida manager that it would get the company in trouble. Jack's demand of an Alabama manager to make campaign contributions, again to be reimbursed by padding expense reports, failed because First American's accounting department refused to approve the expense reports.
 
 
 19
 5. "Salaries" to Former Owners of Acquired Agencies
 
 
 20
 First American was growing rapidly during the late eighties and early nineties; in 1985, it operated only in Georgia, and by 1994 it was in 23 states. The company achieved this rapid expansion by acquiring local home health care providers, often those that were in financial difficulty. First American's cash-flow predicament, however, made it difficult for it to pay for even these ailing agencies. Medicare would not pay for First American's acquisition of other agencies' goodwill.
 
 
 21
 Jack solved this problem in a few cases by inducing the owners of acquired agencies to sell by putting them on First American's payroll to be "community relations" specialists or, as one was told, "vice president of smiles." (R. 36 at 98-99.) Although the details differed from owner to owner, a common thread was that the jobs were sinecures that required a few hours of marketing work a week with no patient care-related responsibilities. Those who sought to do more were rebuffed. Many of these owners in fact pursued other enterprises, such as private health care work or real estate management. For instance, Catherine Brown, former owner of an agency in San Antonio, received $60,000 a year for five years as "salary." After an initial transition period, however, she performed almost no work for First American, working instead on her separate private-care business. Brown's secretary also received a First American salary while performing virtually no work for First American. In all these instances, First American was careful to maintain an appearance of employment, firing the former owners when--as in the case of one Michigan former owner who was imprisoned--they were patently unable to work. Time sheets, often signed in blank by the owners, were also kept.
 
 
 22
 Another aspect of some of the agency acquisitions suggests that a purchase scheme motivated the sinecures' creation. First American avoided paying out of pocket more than a few thousand dollars for any agency, enough to cover the tangible assets such as furniture. Many of the owners had substantial liabilities, however, that they had guaranteed personally. Jack's solution to this problem was to encourage the agencies to delay reporting the purchase to the fiscal intermediary and to continue receiving periodic interim payments, which the owners would use as they pleased. Although the agency would owe those payments back to the government, the agency's sale of its assets to First American would prevent the government from ever collecting the money. Meanwhile, the liabilities would be paid, and the owner would walk away with a handsome employment contract.
 
 
 23
 The importance of this trick to First American's acquisition scheme is illustrated by two instances when owners balked at delaying report of the sale. In the case of one California agency, First American refused to honor the owner's employment contract, which prompted litigation that ended in a judgment in the owner's favor. A New Mexico agency owner refunded the interim payments rather than use them to pay off debts; First American then refused to a honor a contingent note intended to cover the agency's debts left over after the interim payments. Although several former owners independently testified to the existence of this strategy, Jack and current First American employees denied they ever proposed it.
 
 6. Margie's Misrepresentations
 
 24
 The jury convicted Margie of only two acts of falsification. Both related to one trip in a First American plane. Margie filled out and signed two Aetna-mandated passenger manifests to report that she traveled in August 1992 from St. Simons, Georgia to San Antonio and back in connection with First American's acquisition of a home health care provider in Texas. In fact, Margie went to Mobile, Alabama, where the plane stopped en route, to attend her high school reunion. She did not return on the flight back from San Antonio.
 
 7. Jack's Witness Tampering
 
 25
 During the grand jury investigation that led to the indictment in this case, a First American executive, William Edwards, was subpoenaed to testify concerning the campaign contributions that Jack had asked First American executives to make to the Zell Miller gubernatorial campaign and that were reimbursed as bogus bonuses. Edwards at that time had decided to resign from First American. Having obtained a copy of the subpoena, however, Jack offered Edwards about $100,000 to remain in First American's employ until after he had testified before the grand jury. Jack was concerned about the impression it would create for Edwards to resign so soon before testifying. Jack informed Edwards of the company line: that the bonuses were real bonuses, and that the use of the bonuses to make campaign contributions was merely encouraged, not coerced. Edwards refused the offer and resigned.
 
 II. PROCEDURAL HISTORY
 
 26
 A grand jury indicted Jack and Margie with First American, a First American accountant, and James McManus. The 82-count indictment included, against various defendants, one count of conspiracy in violation of 18 U.S.C. § 371; multiple counts of mail fraud in violation of 18 U.S.C. § 1341; receipt of Medicare kickbacks in violation of 42 U.S.C. § 1320; falsification of documents submitted to the government, in violation of 18 U.S.C. § 1001; money laundering in violation of 18 U.S.C. § 1957; filing false tax returns in violation of 26 U.S.C. § 7206; and one count of witness tampering in violation of 18 U.S.C. § 1512. McManus pleaded guilty to the conspiracy charge and testified against the other defendants.
 
 
 27
 Following trial, Jack was convicted of all counts except those for tax evasion. Margie was convicted on only two counts of false statements, both related to the high school reunion flight to Mobile. First American was convicted on all counts against it, and the accountant was acquitted. Following the verdict, the district court granted Jack a judgment of acquittal for mail fraud counts predicated on the mailing of payments for one of First American's planes.
 
 
 28
 Jack and Margie have appealed. Of the many issues they raise, only three merit discussion. We reject their other challenges, which are set out in the margin, without further discussion. See 11th Cir. R. 36-1.[6] The Government has cross-appealed, asserting that the district court improperly granted pretrial judgments of acquittal on several mail fraud counts. We address each of these four issues in turn.
 
 III. DISCUSSION
 
 29
 A. Prior-Act Evidence Admitted Under Fed.R.Evid. 404(b)
 
 
 30
 Margie asks for reversal of her convictions because the district court admitted evidence that in 1993, when she returned from a trip to Europe, she concealed from customs inspectors a purchase of jewelry subject to duty.[7] The district court concluded that the evidence was admissible under Federal Rule of Evidence 404(b) because it showed Margie's "propensity" to conceal facts and was thus relevant to Margie's intent. (R.19-462 at 28.) This court reviews the district court's evidentiary rulings for abuse of discretion. United States v. Diaz-Lizaraza, 981 F.2d 1216, 1224 (11th Cir.1993). Admitting the evidence was an abuse of discretion, but the error is not reversible.
 
 
 31
 Rule 404(b) provides that evidence of offenses other than those charged is admissible only for purposes other than showing character. The Rule has been construed to require a three-part test for admissibility of such "other offenses" evidence. First, the evidence must be relevant to an issue other than the defendant's character. Second, there must be sufficient proof that the defendant committed the extrinsic act. Third, the evidence must survive the balancing test prescribed by Federal Rule of Evidence 403. United States v. Miller, 959 F.2d 1535, 1538 (11th Cir.1992) (en banc); United States v. Utter, 97 F.3d 509, 513 (11th Cir.1996). The proponent of the evidence can satisfy the first prong by showing that the evidence is probative of the defendant's "motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident," if any of these are in dispute. Fed.R.Evid. 404(b); see United States v. Diaz-Lizaraza, 981 F.2d 1216, 1224 (11th Cir.1993).
 
 
 32
 The issue here turns on the first prong; the evidence is ample to satisfy the second prong, and we need not reach the third prong. The Government contends that the first prong is satisfied because the customs incident is relevant to Margie's intent. Margie was charged with violating 18 U.S.C. § 1001, and its intent element requires the Government to prove that Margie wrote the false information on the manifests knowing it was false and intending to make the false statement. See Arthur Pew Const. Co. v. Lipscomb, 965 F.2d 1559, 1576 (11th Cir.1992); United States v. Lange, 528 F.2d 1280, 1288 (5th Cir.1976). According to the Government, the misrepresentation to customs is relevant to this required knowledge and intent because it shows Margie's "willingness to engage in intentional deception of government agents ... for personal financial gain." (Gov't Br. at 37.) Restated, the Government's asserted relevant inference is that we can gather from the customs incident that Margie is disposed to lie to the government; therefore, being a liar, she must have intended to lie on the passenger manifests. This inference is precisely the one that Rule 404(b) prohibits: it makes an element of the crime (intent to lie) more probable because of the defendant's character (liar). Cf. United States v. Utter, 97 F.3d 509, 513-14 (11th Cir.1996).
 
 
 33
 Furthermore, the differences between Margie's falsification of the customs declaration and the falsification of the passenger manifests are simply too great to make the customs incident relevant to Margie's intent in any other way. Cf. United States v. Young, 39 F.3d 1561, 1573 (11th Cir.1994) (evidence of moonshining is not relevant to intent to distribute marijuana because the acts are not sufficiently similar). The key dispute at trial relating to intent was whether Margie knew enough about Aetna's reporting requirements, or even about the meaning of the passenger manifests themselves, to know if what she was writing was false. The customs incident makes Margie's knowledge about the passenger manifests neither more nor less likely. The concealment of the jewelry was unrelated to the Medicare fraud scheme, so it does not imply that Margie participated in Jack's scheme and is therefore more likely to have willfully lied about her destination and travel purposes. The customs declaration form was different from the passenger manifests, and Margie's interpretation of the customs form accordingly casts no light on her understanding of the passenger manifest. This failure of relevance to any issue other than Margie's character makes the admission of the customs incident evidence an abuse of discretion.
 
 
 34
 The error does not, however, compel reversal because we conclude that it had no substantial influence on the jury's guilty verdict on the two § 1001 counts. Cf. Young, 39 F.3d at 1573 (11th Cir.1994) (refusing to reverse a judgment for improper admission of 404(b) testimony, because evidence did not prejudice the defendant's substantial rights). There was overwhelming evidence that Margie intentionally falsified the passenger manifests. The manifests themselves were in evidence, and First American's general counsel, who was on the flight, testified that contrary to the manifest representations Margie did not travel on those flights to San Antonio for business purposes. The organizer of the high school reunion the Millses attended testified to their presence, and a videotape of the reunion showing them was introduced in evidence. Margie's counsel did not cross-examine these witnesses and offered no contradictory evidence. There was copious evidence, moreover, about Margie's other personal use of First American's planes, including testimony that Margie had herself directed "ghosting" of passengers. Furthermore, the passenger manifest that she falsified listed each of several passengers on the plane with a separate entry, making it implausible that she would have misunderstood the "from" and "to" lines to refer to the plane's destination and not to hers.[8] Finally, the jury's not-guilty verdict on most of the falsification counts against Margie implies that the jury's consideration was not tainted by evidence of the customs incident, or any inference from the incident that Margie was a liar.
 
 
 35
 B. Denial of the Opportunity to Cross-Examine
 
 
 36
 Jack contends that the district court denied him his Sixth Amendment right to confront witnesses against him by totally denying him the opportunity to cross-examine one witness. During the trial, the district judge became impatient with the cross-examinations conducted by First American's and Jack's counsel. The judge objected to the "jam-up honey deal" the judge perceived between Jack and his majority-held corporation that led their lawyers to conduct "tag team" cross-examinations representing the same interest. (R.33 at 435; R.34 at 44.) Ultimately, the judge forbade Jack's counsel from examining a Government summary witness, Patricia Terris, at all. The court demanded rather that Jack share First American's counsel for the cross-examination. Jack objected[9] and now contends that the ruling compromised his Sixth Amendment confrontation rights. We consider de novo the legal question of the scope of Jack's constitutional rights, see Kennedy v. Herring, 54 F.3d 678, 682 (11th Cir.1995), and we agree with Jack. The error, however, is harmless beyond a reasonable doubt.
 
 
 37
 The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig, 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990). This concern has prompted the recognition of several different rights guaranteeing adversarial testing of evidence. Accused persons enjoy a qualified right to see witnesses against them in person. See id.; Coy v. Iowa, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). A variety of out-of-court statements may not be used against the criminal defendant. See, e.g., Lee v. Illinois, 476 U.S. 530, 547, 106 S.Ct. 2056, 2065, 90 L.Ed.2d 514 (1986) (admission of one defendant's out-of-court confession incriminating his codefendant forbidden in a joint bench trial); Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (admission of one defendant's out-of-court confession incriminating his codefendant forbidden in a joint jury trial); Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (forbidding admission of transcript of testimony from pretrial hearing in which defendant had no opportunity to cross-examine the witness). A third protection, which originated with Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), ensures more than perfunctory adversarial testing by limiting the trial judge's discretion to restrict the scope of cross-examination. See, e.g., Kentucky v. Stincer, 482 U.S. 730, 737, 107 S.Ct. 2658, 2663, 96 L.Ed.2d 631 (1987); Delaware v. Van Arsdall, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) (defendant not allowed to cross-examine prosecution witness on key source of bias).
 
 
 38
 The Government asserts that the judge at worst reached the edge of the discretion permitted under this third protection. Terris was fully cross-examined for all sources of bias, according to the Government, and thus was amply confronted. The Government further points out that Jack cannot point to a single piece of impeaching evidence that the jury did not hear. Thus, the Government concludes, his confrontation-clause rights have not been compromised. Cf., e.g., United States v. Baptista-Rodriguez, 17 F.3d 1354, 1370-71 (11th Cir.1994); United States v. Bennett, 928 F.2d 1548, 1554 (11th Cir.1996); United States v. Haimowitz, 706 F.2d 1549, 1559 (11th Cir.1983).
 
 
 39
 The Government's analysis overlooks what happened here: Jack did not get to cross-examine the witness at all. A trial judge may limit the scope of cross-examination after the defendant has had some opportunity to cross-examine. See, e.g., Haimowitz, 706 F.2d at 1559; United States v. Tolliver, 665 F.2d 1005, 1008 (11th Cir.1982). But because the district judge permitted Jack no cross-examination, the judge was not operating within any discretion to control the progress of the trial. The district judge's action here differed in quality from the error in the Davis line of cases and cannot be judged by their standard.
 
 
 40
 The judge's action rather merits its own Sixth Amendment rule in accord with other rules based on the Amendment: A trial judge may not totally deny a defendant the opportunity to cross-examine a witness against him, whatever the time constraints, number of defendants being tried, or relationship between the defendants. See Ferguson v. United States, 329 F.2d 923, 924 (10th Cir.1964). In developing other Sixth Amendment rules, the Supreme Court has repeatedly reminded us that the right to cross-examination lies at the root of the Clause's guarantees. See, e.g., Delaware v. Fensterer, 474 U.S. 15, 19-20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) ("The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." (quoting Davis v. Alaska, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 1109-10, 39 L.Ed.2d 347 (1974)) (emphasis in Fensterer )); Chambers v. Mississippi, 410 U.S. 284, 294-95, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973) ("The right[ ] to cross-examine witnesses ha[s] long been recognized as essential to due process."); Douglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965) ("Our cases construing the [confrontation] clause hold that a primary interest secured by it is the right of cross-examination."); In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948) (among the minimum standards of a fair trial is the defendant's "right to examine the witnesses against him"); Mattox v. United States, 156 U.S. 237, 242-43, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895) ("The primary object of the constitutional provision ... was to prevent depositions or ex parte affidavits from being used against the prisoner in lieu of a personal examination and cross-examination of the witness."). The district judge's denial of cross-examination was therefore error.
 
 
 41
 A thornier question is whether the district judge's error requires reversal. Jack insists that the prohibition on cross-examination amounts to a "structural defect" that is never subject to review for prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991) (describing distinction between "trial errors," which are subject to harmless-error review, and "structural defects," which are not). The Government, on the other hand, views the error as one involving the conduct of trial--in other words, a classic trial error that is not ground for disturbing the verdict if the error is "harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); see Fulminante, 499 U.S. at 307-08, 111 S.Ct. at 1264 (trial error is "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt").
 
 
 42
 The Government's argument comports with precedent. While no one could deny the value of the constitutional right to cross-examination, Fulminante 's definitions of "trial error" and "structural defects" make clear that the dividing line is not determined by the importance of the constitutional right. See id. at 306-07, 111 S.Ct. at 1263 (listing examples of appropriate instances for harmless-error analysis and noting that "most constitutional errors can be harmless"). After all, the "harmless beyond a reasonable doubt standard" already respects the constitutional origin of the right and elevates it over mere statutory or evidence-rule rights. The trial error/substantive defect distinction, rather, rests on how the error affected the trial. On one hand, there are errors that infect the whole proceeding, such as a biased judge or an absence of counsel. In those cases, there is no way of imagining how the trial would have looked to the jury without the constitutional error. See Brecht v. Abrahamson, 507 U.S. 619, 629-30, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993) (structural defects "infect the entire trial process" (emphasis added)); Fulminante, 499 U.S. at 309-10, 111 S.Ct. at 1265. For such errors, it is thus impossible to gauge the error's effect. On the other hand, trial errors typically relate only to admission or exclusion of a single piece of evidence. Such errors therefore leave enough of a constitutionally acceptable trial for the reviewing court to assess the effect of the error on the jury's verdict. See id. at 310, 111 S.Ct. at 1265.
 
 
 43
 This error lands squarely in the trial-error category. What has gone awry is that the jury has heard one witness's testimony that is tainted by a lack of cross-examination. Put differently, the jury has heard a piece of evidence--Terris's testimony--that it should not have. In that sense, the error is materially similar to all other Confrontation Clause error. As in the case of Bruton or Davis error, for instance, the jury has heard evidence--in Bruton, an out-of-court statement, here and in Davis, in-court testimony--that has not undergone constitutionally sufficient adversarial testing. And as far as we know, no kind of Confrontation Clause error since Chapman, including Bruton and Davis violations, has escaped harmless-error analysis under the "harmless beyond a reasonable doubt" standard.[10] See, e.g., Delaware v. Van Arsdall, 475 U.S. 673, 681-82, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) (restricted cross-examination in violation of Davis ); Schneble v. Florida, 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972) (Bruton error); see also Coy v. Iowa, 487 U.S. 1012, 1021-22, 108 S.Ct. 2798, 2803, 101 L.Ed.2d 857 (1988) (denial of face-to-face confrontation). In all of these cases, most of the trial was unaffected, and there is therefore a basis on which to assess prejudice. It is true that we cannot know what the cross-examination would have revealed. But if the impossibility of knowing what weaknesses cross-examination would have exposed does not bar harmless-error analysis of Bruton, Davis, or Coy error, it should not do so here.
 
 
 44
 The effect of the error in this case is so closely analogous to that of restricted cross-examination that we can readily look to the harmless-error analysis conducted in such cases for guidance. The Supreme Court has noted five factors to consider in such harmless-error analysis: (1) how important the witness's testimony was to the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. Van Arsdall, 475 U.S. at 684, 106 S.Ct. at 1438. In the present circumstances, there is one variation. For the fourth element we look to the cross-examination conducted by other defendants, rather than the complaining defendant's, to gauge the ultimate effect of Terris's testimony on the jury.
 
 
 45
 The denial of cross-examination is not reversible error in light of these factors. First, Terris was not a vital witness for the prosecution. An auditor, she testified merely as the author of a series of summary charts that depicted the Government's calculation of the total loss to Medicare from Jack's fraud. She knew nothing of the offense conduct; the key evidence of Jack's scheme came from other witnesses and the underlying documents. The auditors from Aetna and First American's later fiscal intermediary, Blue Cross and Blue Shield of Iowa, and witnesses with personal knowledge, such as the pilots, former employees, executives, and lobbyists, all testified as to the actual misrepresentations in the cost reports and the extent of the mail-fraud scheme. Terris's name was mentioned only twice in the Government's closing argument, and then only in passing. While Terris's testimony may have inclined the jury more to convict because it exposed the magnitude of Jack's crime, the documentary and testimonial evidence of guilt was so great that this additional piece would not have changed the jury's verdict.
 
 
 46
 Second, as a summary witness, Terris provided testimony that was by definition cumulative. She testified only as to her analysis of First American's financial records and reports that were in evidence. She had no personal knowledge of any of the information behind the financial reporting and so testified. The third factor yields the same result: Terris's testimony was corroborated and verifiable by inspecting the financial documents on which she based it.
 
 
 47
 Fourth, cross-examination by other lawyers provided a basis to argue Terris's lack of reliability. First American's lawyer pointed out a typographical error in Terris's financial calculations. Other counsel pointed out that Terris may not have reviewed all relevant documents. Jack therefore had a basis on which to argue at closing that Terris's calculation of the loss was untrustworthy. In fact, Jack tellingly identifies not a single additional area of impeachment he intended to explore. That suggests that a retrial would simply involve a different jury's hearing exactly the same evidence.
 
 
 48
 Finally, the prosecution's case was strong. The Government presented testimony from several of the pilots about ghost flights and ghost passengers, personal logs from the pilots showing the ghost flights, and even Post-Its with notes from Jack requesting ghost flights. The secretary, the pilot, and the fuel seller who arranged and then operated the kickback scheme all testified to Jack's involvement, and checks written to Jack were offered to corroborate their testimony. Several non-nurse agency owners, including some who did not sell, independently and consistently testified about First American's employment-based acquisition scheme. First American's lobbyists, whose expenses were claimed as consulting fees, testified to their lobbying activities; memoranda describing those activities were in evidence. Finally, executives who participated in the campaign contributions testified to the pressure they were under to contribute in exchange for a refund, and the circumstances--one executive was called in the middle of house-moving to attend the fundraiser, and another had never contributed to a campaign before giving this $500--corroborate their testimony. And Jack admitted that the bonuses (although described as being for superior performance) were in fact intended to be used for campaign contributions.
 
 
 49
 The defense did not meet this assault. With witness after witness, the defense was limited to diverting attention. For example, it tried to show that the executives who made political contributions at Jack's instance might have made the contributions anyway. With the lobbyists, the defense focused on the merits of PPS and the innocuousness of lobbying per se. The defense impeached some former owners with criminal histories and lawsuits against First American; from others, it elicited testimony about their respect for First American's professional standards; for others, it showed that some work had been done; and the defense offered evidence of other, lawful acquisitions. But apart from conclusory testimony of current First American employees, the defense offered no evidence that any of the former agency owners at issue worked full-time. As to the airplane-related scheme, the defense contended that the falsified and omitted records were not required and that Jim McManus had a scheme of his own that happened to benefit the Millses, not him. Throughout, the defense emphasized that Medicare regulations are complex, that Aetna was evil, and that the true economic losses to Medicare were minimal,[11] but it did not offer evidence suggesting that the various falsifications and misrepresentations were good-faith attempts to seek reimbursement in grey areas. In essence, the overarching defense was that the alleged frauds were legitimate self-defense against intrusive bureaucracy. As Jack vividly put it, "[t]he moment you put [a cost] on there and protest it, you might as well put bells and whistles on it because you know it's coming out." (R.48 at 95.) The absence of Terris's summary testimony would neither have weakened the Government's case nor enhanced the defense strategy.
 
 
 50
 All factors point to the error's harmlessness. We conclude that the total denial of an opportunity to cross-examine, while constitutional error, was harmless beyond a reasonable doubt.
 
 C. Enhancing Sentences for Breach of Trust
 
 51
 Both Margie and Jack challenge the district court's two-level increase, under U.S.S.G. § 3B1.3, of their offense levels for abuse of a position of trust. They argue that the victim was the United States, and that because they owed only contractual, and not fiduciary, duties to the United States, they have breached no cognizable trust. We review the district court's fact findings for clear error, but its determination whether the facts justify an abuse-of-trust enhancement we review de novo. United States v. Kummer, 89 F.3d 1536, 1546 (11th Cir.1996).
 
 
 52
 After submission of this case, another panel of this court resolved this issue in the Millses' favor. A breach-of-trust enhancement under § 3B1.3 is not appropriate unless the victim of the breach itself conferred the trust. United States v. Garrison, 133 F.3d 831, 844-46 (11th Cir.1998). And a Medicare-funded care provider, as a matter of law, does not occupy a position of trust vis-a-vis Medicare. Id. at 852-53. The Millses' sentences could therefore not be enhanced because of any breach of public trust by lying to Medicare.
 
 
 53
 The Millses' presentence reports, however, also found that they abused their positions of private trust as officers of First American. Arguably, First American was a victim of the Millses' crime; because of their actions, it incurred extensive criminal liability and the burden of increased government oversight. But Garrison apparently requires us to hold that the United States is, as a matter of law, the only possible victim of a Medicare-fraud crime and that therefore this private position of trust is irrelevant. See id. at 848 (noting that Garrison was CEO of a health care provider). Section 3B1.3 does not therefore apply to the Millses, and they are entitled to resentencing without the enhancement.
 
 
 54
 D. Judgment of Acquittal on Mail Fraud Counts
 
 
 55
 The Government cross-appeals the district court's judgment of acquittal for Jack on counts 2-5 and 7 after the jury found him guilty on those counts. These mail fraud counts were predicated on the mailing of checks to Beech Aircraft Acceptance Corporation as payment for the First American-owned King Air jet. The district court accepted Jack's argument that there was insufficient evidence to support conviction on these counts because the checks followed the achievement of the fraud's object (receiving interim payments from Aetna), and that they were thus not necessary to the scheme. We review the grant of the judgment of acquittal de novo, drawing all reasonable factual inferences in favor of the jury's guilty verdict. See United States v. Massey, 89 F.3d 1433, 1439 (11th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 983, 136 L.Ed.2d 865 (1997); United States v. Garcia, 13 F.3d 1464, 1473 (11th Cir.1994). We reverse.
 
 
 56
 A mailing is of course one element of mail fraud. See United States v. Brown, 40 F.3d 1218, 1221 (11th Cir.1994), cert. denied, 514 U.S. 1092, 115 S.Ct. 1815, 131 L.Ed.2d 738, and cert. denied, 514 U.S. 1121, 115 S.Ct. 1985, 131 L.Ed.2d 872 (1995). The mailing may be perfectly innocent as long as it is "incidental to an essential part of the scheme" to defraud or a "step in the plot." Schmuck v. United States, 489 U.S. 705, 714, 109 S.Ct. 1443, 1449, 103 L.Ed.2d 734 (1989). The mailing can, therefore, follow the achievement of the object of the fraud, since it may be essential, for example, to avoid detection or to lull the victim into complacency. United States v. Allen, 76 F.3d 1348, 1363 (5th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 121, 136 L.Ed.2d 71 (1997).
 
 
 57
 The evidence at trial was sufficient to convict Jack of the plane payment-based counts. The jury could reasonably have disagreed with the district judge that the fraud was complete before the payment checks were mailed. The evidence supports the inference that the fraudulent scheme was not one to obtain a single interim Medicare payment, as the district judge concluded, but an ongoing one to enjoy private airplane travel at Medicare expense. Under this view of the evidence, the necessity of the payments is evident: No payments, no plane. No plane, no Medicare-funded junkets to Cozumel. That the Millses could have made the same junket in a leased plane, as the district judge observed, is beside the point; that is not our case, and if it were, the mailing of the lease payments would play the same essential role.
 
 
 58
 This case is indeed analogous to Schmuck. Schmuck allegedly engaged in a long-running scheme to buy used cars, roll back their odometers, and sell the cars to dealers at inflated prices. Mail fraud charges against Schmuck rested on the dealers' mailing of title applications to state authorities after the purchase. The Supreme Court rejected the argument that these mailings were not a proper basis because they followed the achievement of the scheme's object. The evidence showed, the Court reasoned, a scheme that extended beyond the sale of a single car. Therefore, even if the mailing were unnecessary to the fraudulent sale just completed, it was essential to future sales because without it the scheme could not survive. See Schmuck, 489 U.S. at 714, 109 S.Ct. at 1449-50. Likewise, here the payments were not essential to any portion of the fraud just completed, whether the object is a particular personal plane trip or a bloated Medicare check. But they were essential to the ongoing fraud, since without the possession of the plane the fraud would have collapsed.
 
 
 59
 We therefore conclude that the evidence was sufficient to convict Jack of mail fraud on counts 2-5 and 7.
 
 IV. CONCLUSION
 
 60
 For the foregoing reasons, we affirm the Millses' convictions. We reverse, however, the judgment of acquittal as to counts 2-5 and 7 against Jack. We also vacate the Millses' sentences and remand for a resentencing that accounts for the convictions on counts 2-5 and 7 and does not include any § 3B1.3 enhancement.
 
 
 61
 AFFIRMED IN PART; REVERSED IN PART; AND VACATED AND REMANDED IN PART.
 
 HATCHETT, Chief Judge, dissenting:
 
 62
 I respectfully dissent from the majority's resolution of the dispositive issues discussed in section III, parts A and B of the opinion. The majority correctly concludes that the district court abused its discretion under Federal Rule of Evidence 404(b) in admitting testimony concerning Margie Mills's untruthful dealings with a United States Customs inspector, and that the district court committed constitutional error in preventing Jack Mills from cross-examining a government witness. I must disagree, however, with the majority's conclusions that the purported 404(b) evidence was harmless as to Margie, and that the outright denial of cross-examination was not a structural error as to Jack. In my view, these errors command retrial.
 
 I.
 
 63
 Regarding section III, part A of the majority's opinion, I would reverse Margie Mills's convictions, vacate her sentence and remand for a new trial. The district court's admission of character evidence, that is, testimony from a U.S. Customs inspector that Margie failed to declare jewelry subject to duty, was harmful error. In my view, the government's case against Margie was a close one, and the improper character evidence affected her substantial rights. See Fed.R.Crim.P. 52(a).
 
 
 64
 At trial, the parties primarily contested two of the five elements under section 1001, falsity and specific intent. See United States v. Calhoon, 97 F.3d 518, 523 (11th Cir.1996) ("To sustain a conviction for violation of 18 U.S.C. [§ ] 1001, the government must prove (1) that a statement was made; (2) that it was false; (3) that it was material; (4) that it was made with specific intent; and (5) that it was within the jurisdiction of an agency of the United States.") (emphasis added), cert. denied, --- U.S. ----, 118 S.Ct. 44, 139 L.Ed.2d 11 (1997). The government's direct evidence of falsity consisted of the manifests themselves, testimony from another passenger, testimony from the organizer of the Mobile, Alabama, high school reunion and a videotape from that event. I agree with the majority that this evidence easily supports a finding that contrary to Margie's entries in the manifests, she did not travel between St. Simons Island, Georgia, and San Antonio, Texas, to acquire a home health care agency.
 
 
 65
 Specific intent, however, is more difficult to prove and is the key element of section 1001. See United States v. Manapat, 928 F.2d 1097, 1101 (11th Cir.1991) ("Unlike other crimes, the crime of making a false statement is unique in that there is no separately demonstrable actus reus. The actus reus and mens reas unite into a single inquiry: Did the defendant know the statement was false when made?"). Unlike its direct evidence of falsity, the government's circumstantial evidence of Margie's specific intent was far from overwhelming. See United States v. Hopkins, 916 F.2d 207, 214 (5th Cir.1990) ("The Government may prove that a false representation is made 'knowingly and willfully' by proof that the defendant acted deliberately and with knowledge that the representation was false."). Apart from relying heavily on the improperly admitted character evidence, the government sought to prove this element through: (1) arguing that the questions on the manifests were unambiguous; (2) evidence of Margie's and Jack's non-business related flights; and (3) testimony from First American's travel coordinator and chief pilot about Margie's instructions not to list her mother on the manifests of at least two flights. Based on this evidence, a reasonable jury could easily waffle about whether Margie knew her entries were false.
 
 
 66
 First, the questions posed in the passenger manifests were not so clear on their face to prove that the answerer necessarily knew if his or her representations were false. The manifests' abbreviated questions--"From," "To," and "Purpose of Trip"--could arguably refer to the activity of the airplane instead of that of the passenger.[1] Under the former construction, Margie's answers would have been true. Indeed, the government presented no evidence that anyone supplementally instructed Margie about the manifests, or that First American administratively involved Margie in its decision to document flight information at Aetna's insistence.[2] Given this arguable ambiguity, it is not surprising that the government sought to prove intent through Margie's specific instances of untruthfulness. See United States v. Bell, 623 F.2d 1132, 1136 (5th Cir.1980) ("[T]he defendant's understanding of the question is a matter for the jury to decide.").
 
 
 67
 Margie's involvement with "ghost flights" and "ghost passengers" provided equally meager proof that she knowingly falsified the manifests. See United States v. Dothard, 666 F.2d 498, 505 (11th Cir.1982) (holding that the district court's improper admission of extrinsic act evidence was not harmless "[i]n view of the meagre evidence presented"). Margie openly and notoriously accompanied Jack on personal flights that he and others chose not to document.[3] Such conduct hardly provided persuasive proof that Margie had the requisite intent to conceal. Although more probative of Margie's intent, her decision not to record her mother's flights in 1993 and 1994 supported, at best, a tenuous inference that she intended to conceal her own flight destinations and purpose in August 1992. Furthermore, with respect to Margie's 1992 and her mother's 1993-94 flights, at least one First American employee used the airplane on those occasions for business purposes, and it actually flew to and from the listed destinations. Therefore, Margie could plausibly reconcile her interpretation of the 1992 manifests' questions as referring to the airplane instead of the passenger.
 
 
 68
 I am convinced that none of these specific instances affected the jury to the degree that the erroneously admitted character evidence did. Without the improper character evidence, the government's proof of intent to falsify was essentially limited to Margie's business conduct. The customs inspector's testimony, however, vastly expanded the scope of Margie's untruthfulness to a context more familiar to the jury than First American. In my view, jurors were much more likely to understand lying to a customs inspector than failing to document travel on a company airplane. At the very least, the customs inspector's testimony uncomfortably invited the jury to connect with, interpret and act upon the notion that Margie was a liar in general.[4] In view of the government's minimally sufficient evidence of Margie's intent, the improper character evidence likely tipped the scales in the government's favor and substantially influenced the jury's verdict. Cf. United States v. Schlei, 122 F.3d 944, 980-81 (11th Cir.1997) (holding that the district court abused its discretion in admitting hearsay evidence but that the error was harmless because the evidence "merely provided cumulative information regarding [the defendant's] actual knowledge" and thus "had no substantial influence on the outcome of this case"). Accordingly, I would hold that the district court abused its discretion and committed harmful error.[5]
 
 II.
 
 69
 Regarding section III, part B of the majority's opinion, I would reverse Jack Mills's convictions, vacate his sentence and remand for a new trial. The majority correctly concludes that the district court violated the Sixth Amendment's Confrontation Clause in denying Jack Mills the opportunity to cross-examine the government's last witness. I disagree, however, with the majority's conclusion that this particular constitutional error is subject to "harmless beyond a reasonable doubt" review. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); Majority Op. at 939.
 
 
 70
 I do not take issue with the majority's assertion that every post-Chapman case involving Confrontation Clause error has employed "harmless beyond a reasonable doubt" review. Of course, none of these or other cases factually involved the complete denial of the opportunity to cross-examine a live trial witness. E.g., Coy v. Iowa, 487 U.S. 1012, 1014-15, 108 S.Ct. 2798, 2799-800, 101 L.Ed.2d 857 (1988) (trial court placed a large screen between defendant and witness stand); Delaware v. Van Arsdall, 475 U.S. 673, 676, 106 S.Ct. 1431, 1433-34, 89 L.Ed.2d 674 (1986) (trial court did not permit defendant to cross-examine a live witness concerning the prosecutor's agreement to dismiss the witness's pending criminal charges); Davis v. Alaska, 415 U.S. 308, 309, 312, 94 S.Ct. 1105, 1107, 1108, 39 L.Ed.2d 347 (1974) (trial court did not permit defendant to cross-examine a live witness concerning his probationary status); Schneble v. Florida, 405 U.S. 427, 427-28, 92 S.Ct. 1056, 1056-58, 31 L.Ed.2d 340 (1972) (trial court admitted non-testifying co-defendant's confession that implicated defendant); Vines v. United States, 28 F.3d 1123, 1125, 1129 (11th Cir.1994) (trial court excused defendant's counsel from the courtroom during the non-inculpatory testimony of two witnesses). Thus, this case presents an issue of first impression: whether the complete denial of a criminal defendant's opportunity to cross-examine a live trial witness is a "trial error," subject to "harmless beyond a reasonable doubt" review, or a "structural defect," mandating reversal without further review. See Brecht v. Abrahamson, 507 U.S. 619, 629-30, 113 S.Ct. 1710, 1717-18, 123 L.Ed.2d 353 (1993); Arizona v. Fulminante, 499 U.S. 279, 307-10, 111 S.Ct. 1246, 1263-65, 113 L.Ed.2d 302 (1991); Vines, 28 F.3d at 1129.
 
 
 71
 Unlike the majority, I find many reasons to label this most egregious constitutional error a structural defect. Since the seminal case of Chapman v. California, the Supreme Court has recognized the necessity of reviewing differently violations of "constitutional rights so basic to a fair trial" from those "which in the setting of a particular case are so unimportant and insignificant that they may ... be deemed harmless." 386 U.S. at 22, 23, 87 S.Ct. at 827. Contrary to the majority's assertion, since the categories' inception, the Court has divided constitutional errors with reference to the importance of the right at issue and the degree of its violation. See Chapman, 386 U.S. at 22, 23, 87 S.Ct. at 827; Van Arsdall, 475 U.S. at 681, 106 S.Ct. at 1436 (contrasting constitutional errors subject to heightened harmless-error review with those "so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case") (emphasis added).
 
 
 72
 More recently, the Supreme Court labeled these two categories "trial error" and "structural defect." See Brecht, 507 U.S. at 629-30, 113 S.Ct. at 1717-18; Fulminante, 499 U.S. at 307-10, 111 S.Ct. at 1263-65. A trial error is one that occurs "during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." Fulminante, 499 U.S. at 307-08, 111 S.Ct. at 1264. Examples include: (1) admission of involuntary confessions in violation of the Fourteenth Amendment's Due Process Clause; (2) admission of confessions obtained in violation of the Sixth Amendment's right to counsel; (3) admission of evidence seized in violation of the Fourth Amendment; (4) prosecutorial comment on the defendant's failure to testify in violation of the Fifth Amendment's right against self-incrimination; (5) temporary absence of defense counsel during non-inculpatory testimony in violation of the Sixth Amendment's right to counsel; and, as relevant to this case, (6) preventing a defendant from cross-examining a prosecution witness for bias in violation of the Sixth Amendment's Confrontation Clause. See Fulminante, 499 U.S. at 307, 309-11, 111 S.Ct. at 1263-64, 1264-66 (citing Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674; other citations omitted); Vines, 28 F.3d at 1129.
 
 
 73
 A structural defect, on the other hand, affects "the framework within which the trial proceeds, rather than simply an error in the trial process itself." Fulminante, 499 U.S. at 310, 111 S.Ct. at 1265. Essentially, a constitutional deprivation becomes a structural defect if it prevents the criminal trial from reliably functioning as a vehicle for determining guilt or innocence and causes the resulting punishment to be regarded as fundamentally unfair. Fulminante, 499 U.S. at 310, 111 S.Ct. at 1265. Examples include: (1) trial before a partial judge in violation of the Fourteenth Amendment's Due Process Clause; (2) exclusion of persons of the defendant's race from serving as grand jurors in violation of the Fourteenth Amendment's Equal Protection Clause; (3) failure to permit the defendant to represent himself in violation of the Sixth Amendment; (4) failure to provide the defendant with a public trial in violation of the Sixth Amendment; and (5) total deprivation of the right to trial counsel in violation of the Sixth Amendment. Fulminante, 499 U.S. at 309-10, 111 S.Ct. at 1264-65.
 
 
 74
 Applying these guidelines, I view the outright denial of cross-examination as a structural defect. Without question, a criminal defendant's opportunity to challenge the evidence against him through the cross-examination of witnesses is a basic, fundamental component of "the framework within which the trial proceeds." Fulminante, 499 U.S. at 310, 111 S.Ct. at 1265; see Pointer v. Texas, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965) ("[P]robably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case."). Needless to say, our criminal justice system would lack reliability and integrity without it. See Chambers v. Mississippi, 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297 (1973) ("[D]enial or significant diminution [of the right to confront and to cross-examine witnesses] calls into question the ultimate integrity of the fact-finding process.") (internal quotation marks omitted). To this aim, the Sixth Amendment's Confrontation Clause guarantees, as one of its two core tenets, the opportunity of cross-examination. See Coy, 487 U.S. at 1017, 108 S.Ct. at 2801; Davis, 415 U.S. at 315-16, 94 S.Ct. at 1110 ("The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.") (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed.1940)) (emphasis in original). Although it could have said otherwise, at least in dicta, the Supreme Court has never stated that all Confrontation Clause errors are trial ones. See, e.g., Coy, 487 U.S. at 1021, 108 S.Ct. at 2803 ("We have recognized that other types of violations of the Confrontation Clause are subject to that harmless-error analysis ... and see no reason why denial of face-to-face confrontation should not be treated the same.") (citing Van Arsdall, 475 U.S. at 679, 684, 106 S.Ct. at 1435, 1438).
 
 
 75
 Quite presumably, then, room exists within our precedent for a declaration that some type of Confrontation Clause error "transcends the criminal process." Fulminante, 499 U.S. at 311, 111 S.Ct. at 1265. As a matter of common sense, I cannot fathom any confrontational error more "structural" than the instant one, that is, allowing only some of the defendants in a joint trial to cross-examine a government witness whose testimony is directed primarily at the excluded defendant. This conclusion is especially appropriate where, as here, the trial court's ruling implicated more than just the most vital protection under the Confrontation Clause. At a minimum, preventing Jack's counsel from questioning an inculpatory government witness and relying on First American's counsel to effectively represent Jack's interests touched upon Jack's constitutional rights to due process, counsel at all material stages of criminal proceedings and conflict-free representation. See Chambers, 410 U.S. at 295, 93 S.Ct. at 1045-46 (due process); Gideon v. Wainwright, 372 U.S. 335, 343-44, 83 S.Ct. 792, 796-97, 9 L.Ed.2d 799 (1963) (counsel); Burger v. Kemp, 483 U.S. 776, 783, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987) (conflict-free counsel).
 
 
 76
 I recognize that the majority's view is not without textual support. Chronologically speaking, the cross-examination ruling did occur "during the presentation of the case to the jury." Fulminante, 499 U.S. at 307, 111 S.Ct. at 1264. Further, as compared to previously-established structural defects, the effect of the ruling would certainly appear to be more susceptible to "quantitative[ ] assess[ment]." Fulminante, 499 U.S. at 308, 111 S.Ct. at 1264. In my view, however, finding a "trial error" in the complete denial of cross-examination--even if limited to one defendant and one summary witness--is superficially correct at best.
 
 
 77
 For the Confrontation Clause to have any meaningful application, an important distinction must be drawn between an outright denial of its protections and a restriction on the degree to which the clause's rights may be exercised. Accord Van Arsdall, 475 U.S. at 684, 106 S.Ct. at 1438 (remanding for a determination of whether preventing the defendant from cross-examining the defendant's witness for bias was harmless beyond a reasonable doubt); Davis, 415 U.S. at 318, 94 S.Ct. at 1111 (holding that "no amount of showing of want of prejudice" cured the trial court's severe restriction on defendant's right to cross-examine a key prosecution witness for bias) (citation omitted); United States v. Cruz, 127 F.3d 791, 801-02 (9th Cir.1997) (upholding as constitutional the trial court's request that one defense counsel conduct the "main" cross-examination for all defendants because it permissibly limited non-repetitive questioning and "all the attorneys had the opportunity to cross-examine government witnesses as to issues particular to their clients"), cert. denied, --- U.S. ----, 118 S.Ct. 896, 139 L.Ed.2d 881 (1998). Compare Fulminante, 499 U.S. at 309, 111 S.Ct. at 1264-65 (the "total" deprivation of the right to trial counsel is a structural defect) with Vines, 28 F.3d at 1129 (the "temporary" deprivation of the right to trial counsel is a trial error). The "constitutional error of the first magnitude" which occurred in this case eliminated an element essential to the functioning of a criminal trial, the accused's opportunity to cross-examine each and every live trial witness against him. Davis, 415 U.S. at 318, 94 S.Ct. at 1111; accord United States v. Houlihan, 92 F.3d 1271, 1296 (1st Cir.1996) (Absent special circumstances, "the [Confrontation] Clause does not create a right to ... cross-examine persons who appear as witnesses exclusively against others (even if the others are codefendants in a joint trial)."), cert. denied, --- U.S. ----, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997). Accordingly, I would hold that the district court's failure to provide any opportunity for Jack Mills to cross-examine the government's last witness constituted a structural defect that mandates reversal per se.
 
 
 78
 For the foregoing reasons, I respectfully dissent.
 
 
 
 [1]
 We refer to the Millses by their first names for convenience
 
 
 [2]
 We will refer to the corporation, regardless of the time frame, as "First American."
 
 
 [3]
 An industry publication also quoted Jack in a similar vein
 
 
 [4]
 Jack told many of the witnesses that he had a 1963 electrical engineering degree from Auburn University. In fact, he never attended Auburn and has only a high school education
 
 
 [5]
 One such flight to Cozumel the week before the meeting carried both Jack and Phears
 
 
 [6]
 Jack contends (1) that the government used perjured testimony before the grand jury to secure the indictment against him; (2) that the district court erroneously refused to instruct the jury on the ambiguity of Medicare regulations; (3) that exclusion of four pieces of evidence deprived Jack of his right to present a complete defense; (4) that the Government's proof about salaries paid to former owners fatally varied from the indictment; (5) the district court improperly considered ex parte evidence at sentencing; and (6) the district court abused its discretion in departing upward from the Sentencing Guidelines on the fine imposed. Margie asserts (1) that the evidence was insufficient to support the verdict against her; (2) that the district court included too much conduct as relevant in calculating the amount of loss occasioned by her false statements; and (3) that the district court improperly enhanced her offense level for her leadership role in the offense
 
 
 [7]
 Jack adopts Margie's challenge to the district court's admission of the evidence. We reject his challenge because the evidence did not implicate him in the customs falsification, and any error was unlikely to have any effect on the jury verdicts against him
 
 
 [8]
 Intent to defraud is not an element of a violation of § 1001. See United States v. Manapat, 928 F.2d 1097, 1101 (11th Cir.1991). Therefore, the Government did not need to prove, nor did the jury need to find, that Margie knew that she was defrauding Medicare. The jury just needed to find that Margie knew the statements were false when she wrote them and that she meant to write them down. Thus, the Government's case was not significantly weakened, as the dissent implies, by the absence of any evidence that Margie knew about the purpose of the manifests or about Aetna's plane travel reimbursement policies
 
 
 [9]
 The Government asks the court to decline to address this issue at all because Jack failed to make a proffer. Because it is doubtful that the right to confront arises only when the defendant has worthwhile confrontation, we conclude that the failure to proffer does not bar consideration
 
 
 [10]
 Pre-Chapman Confrontation Clause cases did not engage in harmless-error analysis. See, e.g., Alford v. United States, 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931); Dixon v. United States, 333 F.2d 348, 353 (5th Cir.1964). Needless to say, Chapman and subsequent cases have changed the law in that respect
 
 
 [11]
 Here, the defense contended that the costs may have been reasonable and allowable, had they been something other than what they were--nonallowable expenses. For instance, Jack's counsel questioned one auditor whether it cost more to fly a plane with four passengers than with three. The auditor admitted that it does not, but pointed out the portion of costs attributable to a passenger whose trip did not relate to patient care would be disallowed. Likewise, the defense argued that the $500 bonus to top executives to reimburse them for campaign contributions would have been fine as additional salary, even though campaign contributions were not allowable
 
 
 [1]
 The August 1, 1992 manifest, which is the subject of Count 38, reads in pertinent part:
 DATE: 8/1/92 AIRCRAFT # 89HB
 [two identical entries as to Stephen Johnson and Jack Mills]
 
 
 [3]
 Name: MARGIE MILLS Signature: /s/
 From: SSI To: San Antonio
 Purpose of Trip: ACQUISITION
 The August 2, 1992 manifest, which is the subject of Count 40, reads in pertinent part:
 DATE: 8-9-92 AIRCRAFT # 89HB
 
 
 [1]
 Name: Margie Mills Signature: /s/
 From: SAN ANTONIO To: SSI
 Purpose of Trip: RETURN FROM ACQUISITION
 [two substantially identical entries as to Stephen Johnson and Jack Mills]
 
 
 [2]
 My reference to this particular lack of evidence is not intended to suggest that the government had to prove intent to defraud. See Maj. Op. at 936 n. 8. Rather, I mention it only to underscore that Margie's interpretative frame of reference was limited to the manifests themselves
 
 
 [3]
 At that time, Aetna did not require passengers like Margie to document their travel
 
 
 [4]
 It should be emphasized that Margie did not testify on her own behalf and, therefore, the rules of evidence did not entitle the government to impeach her. See generally Fed.R.Evid. 608 (discussing the admissibility of character evidence to impeach a witness)
 
 
 [5]
 Unlike the majority, I do not view the jury's acquitting Margie on most of the counts against her as any indication that the improper evidence did not taint the jury's consideration of Counts 38 and 40. If anything, the jury's verdict supports my position that the government's case was a close one